[No. B197018. Second Dist., Div. Seven. Mar. 12, 2008.]

COMMITTEE TO SAVE THE HOLLYWOODLAND SPECIFIC PLAN
et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Respondent;
ROBERT J. CUTLER, Real Party in Interest and Respondent.

## COUNSEL

Chatten-Brown & Carstens, Jan Chatten-Brown and Douglas P. Carstens for Plaintiffs and Appellants.

Cara Rule for Hollywoodland Homeowners Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, Claudia McGee Henry, Assistant City Attorney, and Gerald M. Sato, Deputy City Attorney, for Defendant and Respondent.

Gilchrist & Rutter, Frank Gooch III, Martin N. Burton and Phillipa L. Altmann for Real Party in Interest and Respondent.

## OPINION

ZELON, J.—Petitioners Committee to Save the Hollywoodland Specific Plan and Hollywood Heritage (collectively the Committee or petitioners) appeal judgment on their petition for peremptory writ of mandate. Petitioners sought to compel the City of Los Angeles (City) to rescind its approval of a specific plan exception for a wooden fence that a homeowner had constructed atop one of the historic granite walls of Hollywoodland. The trial court denied the petition, finding the City properly relied on an exception to the Hollywoodland Specific Plan (HSP) and a categorical exemption under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) to approve the fence. We affirm in part and reverse in part, concluding that although under the terms of the HSP and the municipal code, the City properly granted an exception to the HSP, under CEQA, the City improperly granted an exemption.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In the early 1920's, when the Hollywoodland housing tract was developed, European stonemasons constructed numerous granite support walls abutting the winding, curving streets of the area. In 1991, the City designated the walls, along with several staircases in the area, as Historic-Cultural Monument No. 535. In 1992, the City adopted the HSP in part to provide protection for these walls. The HSP states its purpose is to "protect Hollywoodland, a unique and historical residential community in Hollywood, planned in the early 1920's as a custom home, single-family subdivision with a 'European Village' character."

The record reflects that numerous homes in the tract have granite walls ranging from three to 20 feet in height; many of these have no fences or guardrails. The record also contains photographs depicting numerous wooden

fences atop curbs. Section 7.B.2. of the HSP provides, "No structures, including fences or walls, shall be attached to a Granite Wall or Granite Stairway when the Wall or Stairway is located in a public right-of-way." The HSP at section 7.B.1. prohibited new fences or walls in excess of six feet built within three feet of the lot line. In addition, the City's administrative code provided that "[n]o permit for demolition, substantial alteration or relocation of any building, structure or site contained in said list shall be issued, and no such site, building or structure shall be . . . substantially altered . . . without first referring the matter to the [City's Cultural Heritage] Commission. . . ."[1] (Los Angeles Admin. Code, former § 22.132.)[2]

### 1. The Administrative Proceedings Before the City.

In September 2002, Mike and Laura Armstrong, the owners of property at 3200 Durand Drive, constructed an unpermitted six-foot-high wooden fence atop one of the granite walls supporting Durand Drive which abuts the rear of the property. The Armstrongs' property consists of three parcels, and the street curves around all three parcels. The fence is 165 feet long. The property sits below the street grade, and the granite wall, which is about 15 feet high, is not visible from the street. Only the fence can be seen from the street, as well as a guardrail that runs along a portion of the fence. Architectural renderings in the record depict the current wooden fence attached to a curb that sits atop the granite wall.

On February 27, 2003, the City's department of building and safety issued an order to comply to the Armstrongs for a violation of Los Angeles Municipal Code section 12.21.A.1.(a),[3] citing the fence as being in violation of the HSP, and ordering its removal. The order specifically noted that the fence had been erected on "city property [which is also a registered

---

[1] Los Angeles Administrative Code section 22.171 created the commission, whose purpose is to "perform those functions relating to historic and cultural preservation of sites, buildings, or structures that embody the heritage, history, and culture of the City." (L.A. Admin. Code, § 22.171; see L.A. Admin. Code, former § 22.132.)

[2] Effective April 2, 2007, division 22, chapter 7, of the Los Angeles Administrative Code, the provisions relating to the cultural heritage commission, was repealed. Those provisions were added to division 22, chapter 9, of the Los Angeles Administrative Code at article 1. (L.A. City Ord. No. 178,402.) The provisions comparable to Los Angeles Administrative Code former section 22.132 are now at section 22.171.14, which provides in relevant part that "No permit for the demolition, substantial alteration or relocation of any Monument shall be issued, and no Monument shall be demolished, substantially altered or relocated without first referring the matter to the [Cultural Heritage] Commission . . . ." (L.A. Admin. Code, § 22.171.14.)

[3] That section states, "No building or structure shall be erected, reconstructed, structurally altered, enlarged, moved, or maintained, nor shall any building, structure, or land be used or designed to be used for any use other than is permitted in the zone in which such building, structure, or land is located and then only after applying for and securing all permits and licenses required by all laws and ordinances." (L.A. Mun. Code, § 12.21.A.1.(a).)

historical/cultural monument] and [did] not observ[e] the required 3', set-back . . . required by the Hollywoodland Specific Plan. . . ."

In November 2003, the Armstrongs applied for an exception to the HSP to allow them to construct a new fence to replace the unpermitted fence. The application stated that the "fence is necessary for safety reasons as Durand ranges from seven to seventeen feet above the Armstrongs [*sic*] property. There is no barrier or guard rail along Durand at this location to prevent vehicles or pedestrians from [falling] into the Armstrongs' property. . . . There have been past instances of vehicles and people falling off of Durand Drive and into the Armstrongs' property." The application stated that enforcement of the three-foot setback rule was not feasible because Durand Drive was above the grade of the Armstrongs' property, and that the lot adjacent to the fence was used as their backyard. "As the wall that supports Durand Drive sits partially on the property owned by the Armstrongs, the construction of a fence on top of the curb is the only feasible method of erecting a barrier to prevent pedestrians and vehicles from falling into the Armstrongs' lot."

In February 2004, Robert J. Cutler purchased the Armstrongs' home.

On March 12, 2004, Hollywood Heritage wrote to the City's planning department, stating that "[t]he fence negatively impacts the city landmark granite retaining wall at that address and sets a precedent to further degradation of the historically-designated stone walls within the Hollywoodland tract. [¶] The owner who erected the fence claimed it was done for safety reasons but, based on an in-person inspection, it is obviously not so. A steel guardrail in front of the fence, as is installed elsewhere throughout the Hollywoodland tract, would prevent a car from crashing through it. . . . [¶] It is obvious that the true purpose of the fence is aesthetic, to provide privacy for the house's backyard and pool. While this is understandable, it is not grounds for a variance of the historic designation. . . . [¶] For privacy we suggest the owners plant a hedge or cedar trees between the pool and the retaining wall."

On August 5, 2004, the City's historic preservation section recommended denial of the application because the wooden fence was not an appropriate treatment of the historic resource. The historic preservation section recommended that any subsequent proposed alterations or additions to the monument be reviewed by the cultural heritage commission, and that the project conform to the Secretary of the Interior's Standards for the Treatment of Historic Properties (36 C.F.R. § 68 (2007)).[4] The Hollywoodland design

---

[4] Those standards provide in relevant part that "A property will be used as it was historically or be given a new use that requires minimal change to its distinctive materials, features, spaces

review board (DRB)[5] recommended denial of the application because the homeowners had refused to meet with them to discuss compromises. Several neighbors wrote to the City in support of the wooden fence, and several expressed their opposition.

Cutler submitted a report from a garden design firm stating that the planting of a ficus hedge or other trees would not address the safety issues. The plants would need to reach 25 feet in height, and at such height would not be sufficiently full to constitute a barrier; trees would need to be planted too close together to make a uniform hedge; and ficus roots were destructive, and could damage the wall.

The City held a hearing August 27, 2004, to consider the exception.

On September 8, 2004, the Hollywoodland DRB wrote the City and advised it that any safety railing would need to withstand a 20-pound-per-linear-foot load, and that such load would be transferred to the historic wall; generally, an architect or engineer would need to calculate whether the proposed design could withstand the load, but to the DRB's knowledge, no such study had been done. Another member of the DRB wrote to advise the City that Durand Drive's upslope and downslope granite walls rested on the public curb, and that it was "assumed the curbs were installed at the same time as the walls. . . ."

Following the hearing, on September 28, 2004, the City's department of building and safety issued a report (the Tokunaga Report). The Tokunaga Report recommended that the exception be disapproved, but recommended instead a 42-inch fence be built in place of the existing fence, with no other structures within the three-foot setback area. The Tokunaga Report required, prior to the issuance of any permits, that a detailed site and elevation plan be submitted for review to the satisfaction of the cultural heritage commission and the design review board staff of the planning department. The Tokunaga Report specifically found:

1. Strict application of the regulations of the HSP to the property would result in practical difficulties or unnecessary hardships inconsistent with the general purpose and intent of the HSP. In particular, the report found that the subject property consisted of three parcels; the portion of the property used as a rear yard was technically the front yard because all three parcels fronted on Durand Drive; the HSP required a three-foot setback; the Armstrongs' five-foot six-inch fence was unpermitted and installed upon an existing eight-inch curb

and spatial relationships. [¶] . . . The historic character of a property will be retained and preserved. . . ." (36 C.F.R. § 68.3(b)(1), (2) (2007).)

[5] The DRB was created by the HSP and meets twice a month.

and metal guardrail that were inadequate to prevent cars or pedestrians from falling into the yard. The proposed shorter fence would provide both safety and privacy.

2. There were exceptional circumstances or conditions which were applicable to the subject property or to the intended use of the development of the subject property that generally do not apply to other properties within the specific plan area. In particular, the report found that portions of the street were 15 feet above the rear yard, and that if the three-foot setback requirement was imposed, there would be a three-foot gap between the wall and the flat portions of the yard.

3. The requested exception was necessary for the preservation and enjoyment of a substantial property right or use generally possessed by other property within the area, but which, "because of such special circumstances and practical difficulties or unnecessary hardships, [was] denied the property in question." In particular, the report found that the significant grade difference made compliance with the three-foot setback rule a practical difficulty.

4. The granting of the exception would not be detrimental to the public welfare and injurious to property or improvements adjacent to or in the vicinity of the subject property. The report noted that "A 42-inch in height fence along this section of Durand Drive will offer public safety to the motorists and pedestrians who use this portion of the street. Without the fence, the only separation between the yard of the homeowner and a falling car or object (including pedestrians) is an 8-inch curb and metal guard rail. A three-foot setback offers no additional benefit in providing safety and would actually create a three-foot gap between the curbed granite wall and a fence, providing enough space for debris to accumulate as well as space for automobiles and pedestrians to fall into."

5. The granting of the exception was consistent with the principles, intent and goals of the HSP. The Tokunaga Report found that the HSP required new fences and walls to maintain a three-foot setback from the front lot line; the requirement was intended to provide a buffer between the street and the entrance to the house so that persons could enter the home without directly walking or driving onto the street. However, the Armstrongs' lot line was actually the rear yard, and there was no entrance to invoke the rationale behind the setback rule.

The Tokunaga Report found the project would not have a significant effect on the environment and found it exempt under CEQA.

On November 5, 2004, the City issued its notice of exemption from CEQA for the specific plan exception issued to the Armstrongs.

On December 13, 2004, the Committee to Save the Hollywoodland Specific Plan wrote to the City's planning commission to object to the Tokunaga Report. The committee took the position that no HSP exception should be granted because the findings of the report, necessary under Los Angeles Municipal Code section 11.5.7.D.1.[6] for a specific plan exception, could not be factually supported. Further, the permit would confer upon the owner a special privilege not enjoyed by other owners in the area in violation of Los Angeles Municipal Code section 11.5.7.D.1.

The committee contended a categorical exemption was inapplicable because the exemption was limited to "minor area variances, building location and configuration variances, yard variances, or slight modifications which do not result in any change in land use or additional dwelling units." Furthermore, even if the exemption applied, the committee contended it would not be allowed because the project had a potentially significant impact on a historic resource because the fence had been constructed by making significant alteration to the stone wall. The committee proposed alternatives of screen planting, and requested that the fence was not required because a steel guardrail, not touching the historic monument, would serve the safety objectives. Finally, the committee took the position that the curb was City property, as evidenced by the order to comply issued February 27, 2003 (the applicants had "erect[ed] a 6' wooden fence on City property which is also a registered historical/cultural monument"), triggering the review requirement of Los Angeles Municipal Code section 62.105.[7]

A planning commission meeting was held December 14, 2004. Cutler advised the planning commission that he had gone before the Hollywoodland DRB and reached a compromise concerning fence design that involved the installation of a five-foot, open wrought iron fence. Cutler asked the planning commission to support the new design and to amend its recommendation to approve the specific plan exception for the installation of a five-foot wrought iron fence. Petitioners appeared and opposed the exception on the grounds

---

[6] That section provides, "1. Modification Procedure. To modify an approved project, an applicant shall file an application with the Department of City Planning pursuant to the application procedure set forth in Paragraph (a) of Subdivision 2 of Subsection B. The application shall include an illustrated description of the proposed modification and a narrative justification. Written proof of any modification required by a public agency shall be submitted with the application." (L.A. Mun. Code, § 11.5.7.D.1.)

[7] Section 62.105 provides in relevant part that "No person shall lay, construct, reconstruct or repair in any street or in, over or through any property or right of way owned by or under the control of the City, any curb, sidewalk, gutter, driveway, approach, roadway surface, pavement, sanitary sewer, sewage works, storm drain, culvert, stairway, retaining wall or similar structure, building or improvement, or perform any grading or filling, or subject any sewer or storm drain to excessive live or dead loading without first obtaining written permit therefor from the Board and . . . approval of plans and specifications and the lines and grades therefor from the City Engineer." (L.A. Mun. Code, § 62.105(a).)

that it was an erosion of the plan itself and in violation of Los Angeles Municipal Code section 11.5.7. (specific plan procedures), and that the situation was not unique nor did it present a hardship. They pointed to other houses in the neighborhood that had dealt with privacy and safety issues without altering landmarks. Further, the proposed fence was on the public right-of-way. With respect to this last point, Tokunaga informed the commission that it was not the City's intent to take a position where the fence stood, but that the City viewed the granite wall and curb as one, and that was the reason for sending the matter for ultimate review to the cultural heritage commission.

On December 28, 2004, the City's planning commission issued its determination disapproving the specific exception as requested, but approving an exception that permitted a 54-inch fence, measured from the top of the curb (which measures eight inches) adjoining the property. The commission adopted the Tokunaga Report's findings and found a categorical exemption under CEQA.

On January 12, 2005, the Committee to Save the Hollywoodland Specific Plan, Hollywood Heritage, and Hollywood United Neighborhood Council appealed the commission's determination to the city council, on the grounds set forth in the Committee's December 13, 2004 letter, a copy of which was attached to the appeal.[8]

On March 4, 2005, Cutler, who was now the owner of the property, wrote to the planning and land use management (PLUM) committee in support of the planning commission's approval of the 54-inch fence. Cutler pointed out that the fence had been built by the previous owners, and although the fence was close to the granite retaining wall, it did not come into contact with it. A curb sat on top of the retaining wall, and the fence was attached to the curb; poles drilled into the curb did not touch the retaining wall. Cutler pointed out that it was imperative that either the City or he take action to prevent injury to persons, and that he was willing to pursue appropriate City approvals for the fence. To that end, Cutler proposed to build a fence that took into account public safety, but that did not jeopardize the integrity of the historic monument.

The city council set a hearing before its PLUM committee to consider the appeal for March 9, 2005, and set a hearing before the full city council for March 23, 2005. The PLUM committee meeting was continued to March 30, 2005. At the meeting, Tokunaga informed the PLUM committee that as part

---

[8] The Hollywood United Neighborhood Council withdrew from the appeal after reaching a design compromise with Robert Cutler concerning the fence.

of the approval of the fence, the new owner was required to go before the design review board of the planning department for approval, and that the planning department recommended denial of the appeal.

One homeowner in attendance objected to the fence because the curb was public property, the current fence and the proposed fence would both rest upon the curb, and attaching a fence to the unreinforced granite wall would impose weight upon the wall. Furthermore, the review of the project had not included a survey or a study by a landscape architect or a structural engineer.

The president of Hollywood Heritage stated that if the City allowed the fence to be installed as planned, it would create bad precedent. Further, the City admitted that the existing eight-inch curb and metal K-rail guardrail were inadequate to prevent cars from driving over the curb or pedestrians from falling into the yard.

The Committee requested that the PLUM committee deny the categorical exemption to section 7.B.1. of the HSP because the proposed new wall would be on top of the cultural monument which is on the public right-of-way, and would therefore violate HSP section 7.B.2., as well as being a significant alteration to a cultural monument. Denial of the categorical exemption would permit review of alternative safety features more appropriate to the monument. Cutler requested the exception be approved.

The Hollywoodland Homeowners Association stated that they would rather see an aesthetically pleasing fence than an extended guardrail, and had in December 2004 approved the DRB's approval of the revised plans. The PLUM committee denied the appeal.

Cutler requested and received a continuance of the city council meeting to April 13, 2005. At the meeting, the city council adopted the categorical exemption and PLUM committee report to the specific plan exception from the HSP. The council found the action was categorically exempt from CEQA pursuant to the City's environmental guidelines.[9] The council adopted the planning commission's findings, and denied the Committee's appeal.

On April 13, 2005, the City issued its exception to the HSP.

---

[9] A class 5 exemption from CEQA in relevant part "consists of minor alterations in land use limitations in areas with an average slope of less than 20%, which do not result in any changes in land use or density, including but not limited to: [¶] (a) Minor lot line adjustments, side yard, and set back variances not resulting in the creation of any new parcel . . . ." (Cal. Code Regs., tit. 14, § 15305.) The City's parallel provision states, "10) Minor area variances, building location and configuration variances, yard variances, or slight modifications which do not result in any change in land use or additional dwelling units." (City of L.A. Environmental Quality Act Guidelines, art. III, sec. 1, par. e(10).)

2. *The Petition for Writ of Mandamus.*

On May 18, 2005, petitioners filed their petition for writ of mandate seeking to set aside the City's approval of the exception to the HSP and ordering removal of the fence.

After several stays of the action to pursue settlement, the trial court set the matter for hearing on November 2, 2006.

Petitioners argued that the specific exception to the HSP constituted a special privilege that violated the Los Angeles Municipal Code because the fence was located on the public right-of-way. They argued that Cutler's property was not unique in the area, and did not suffer from unnecessary hardships sufficient to support a variance. Furthermore, substantial evidence did not support the City's determination that the exception qualified as a class 5 categorical exemption under CEQA because it was not a "minor" alteration in land use limitations. They argued that even if the fence fit within the terms of the categorical exemption, the City could not apply the exemption because the proposed fence impacted the granite wall and had a significant impact upon the environment by destroying the European village character of the neighborhood.

The City argued that strict application of the HSP to the property would result in practical difficulties and unnecessary hardships inconsistent with the purpose of the HSP; the property's circumstances were unique; an exception was necessary for the preservation and enjoyment of a substantial property right; the exception would not be detrimental to the public welfare or injurious to the property or adjacent properties; and the exception was consistent with the HSP. The City also contended the exception was categorically exempt for alterations in land use limitations because the proposed fence did not result in any changes to the property, nor was it attached to the granite wall.

Cutler opposed, contending that the City's findings supported a hardship. The subject portion of the property was used as a side and rear yard; the existing curb and guardrail were inadequate; and the setback requirement's rationale would not be served by its enforcement because of the gap created. Further, Cutler argued the CEQA exemption was supported because in applying the exception, the City necessarily rejected any contention that the granite wall was on the public right-of-way; Cutler presented evidence it was on his property; and, because the fence would not be attached to the granite wall, it would not be altered in any fashion.

Petitioners replied that the City granted an exception for an encroachment onto the setback, not for an attachment of a fence to a granite wall within the

public right-of-way. Petitioners disputed Cutler's claim that the fence was not on the wall and was not in the public right-of-way, and contended the curb was part of the historic granite wall. They contended Cutler engaged in a "bait and switch" by seeking approval for one design of fence, and then obtaining approval for another. Finally, they asserted the proposed design is unsafe.

At the hearing, the Committee argued that the HSP required the City to get more input from city planners, the DRB, and the cultural heritage commission before approval, and therefore the process had been conducted in reverse. The Committee also contended that there was extensive evidence of negative impact on the stone wall, and that although there was evidence in the record to support the City's position, this impact evidence outweighed evidence supporting the granting of the exception. Finally, the Committee contended the City erred in granting relief from self-imposed hardships under Los Angeles Municipal Code section 11.5.7.

On December 14, 2006, the trial court entered its judgment denying the petition. The court found substantial evidence supported City's findings, noting that "At 165 feet, the property has one of the longest lots abutting Durand Drive. Because of the acquisition of the adjacent properties, the rear yard is technically listed as having a front lot line, but there is no entrance or exit from this parcel. Most other homes in the area have rear and side yard fences up to six feet high and the plan allows those. There will be no detriment to the public welfare because the fence will help ensure the safety of people and cars. The gap between the curb and a three foot setback would create an unacceptable safety risk. The practical difficulties of the property in question warrant the exception." The court also found the exception qualified under categorical exemption class 5 (Cal. Code Regs., tit. 14, § 15305; City of L.A. Environmental Quality Act Guidelines, art. III, par. e(10) [class 5]) because there was no substantial change to the historical resources. The court specifically found that the wall was below grade, not on the public right-of-way, and a fence on top of the curb supported by the wall would not affect the resource.

## DISCUSSION

The Committee contends that (1) the City's grant of an exception to the HSP was erroneous because the exception violated the HSP, the municipal code and height restrictions, and the fence improperly relieved a self-imposed hardship; and (2) the City erroneously relied upon a CEQA exemption.

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE SPECIFIC PLAN EXCEPTION.

### A. Standard of Review.

When evaluating the validity of an administrative decision, both the trial court and appellate court perform the same function: we will affirm the City's decision if it is supported by substantial evidence. In doing so, we review the entire record. We may not interfere with the City's discretionary judgments and must resolve reasonable doubts in favor of the administrative findings and decision. (Code Civ. Proc., § 1094.5, subd. (b); *Dore v. County of Ventura* (1994) 23 Cal.App.4th 320, 326–327 [28 Cal.Rptr.2d 299].) We may not substitute our judgment for the City's and reverse because we believe a contrary finding would have been equally or more reasonable. (*Cipriotti v. Board of Directors* (1983) 147 Cal.App.3d 144, 155 [196 Cal.Rptr. 367].) However, although the City was required to make and expressly state certain findings, we do not presume that the City's decision was based on the required findings or that those findings are supported by substantial evidence. (*J. L. Thomas, Inc. v. County of Los Angeles* (1991) 232 Cal.App.3d 916, 926 [283 Cal.Rptr. 815].)

### B. The City's Findings Complied with the Requirements of the Los Angeles Municipal Code Regarding Specific Plan Exceptions.

The Committee argues that the City's approval of the specific plan exception violates Los Angeles Municipal Code section 11.5.7.F.2. because the evidence does not support a finding of unnecessary hardship and the necessity of preserving the enjoyment of a substantial property right; further, the City improperly provided relief from a self-imposed hardship. We disagree, because a reading of the HSP and the relevant municipal code provisions demonstrates that the City complied with them.

The guidelines for exceptions from the City's specific plan are contained in Los Angeles Municipal Code section 11.5.7.F.2. Under that ordinance, before granting an exception, the City was required to make five findings:

"(a) That the strict application of the regulations of the specific plan to the subject property would result in practical difficulties or unnecessary hardships inconsistent with the general purpose and intent of the specific plan;

"(b) That there are exceptional circumstances or conditions applicable to the subject property involved or to the intended use or development of the subject property that do not apply generally to other property in the specific plan area;

"(c) That an exception from the specific plan is necessary for the preservation and enjoyment of a substantial property right or use generally possessed by other property within the specific plan area in the same zone and vicinity but which, because of special circumstances and practical difficulties or unnecessary hardships is denied to the property in question;

"(d) That the granting of an exception will not be detrimental to the public welfare or injurious to the property or improvements adjacent to or in the vicinity of the subject property; and

■ "(e) That the granting of an exception will be consistent with the principles, intent and goals of the specific plan and any applicable element of the general plan." (L.A. Mun. Code, § 11.5.7.F.2.)[10] The standards for granting variances and exceptions must be sufficiently broad and flexible to provide municipalities with the necessary discretion to address a wide variety of circumstances. (*Matthews v. Board of Supervisors* (1962) 203 Cal.App.2d 800, 803 [21 Cal.Rptr. 914].)

■ A zoning variance, and by analogy a specific plan exception, must be "grounded in conditions peculiar to the particular lot as distinguished from other property" in the specific plan area. (*Zakessian v. City of Sausalito* (1972) 28 Cal.App.3d 794, 799–800 [105 Cal.Rptr. 105] (*Zakessian*).) Unnecessary hardship therefore occurs where the natural condition or topography of the land places the landowner at a disadvantage vis-à-vis other landowners in the area, such as peculiarities of the size, shape or grade of the parcel. (*Id.* at p. 800.) *Zakessian* also discerned in the hardship requirement an additional finding that the hardship be substantial, and that the exception sought must be in harmony with the intent of the zoning laws. (*Id.* at p. 801.)

Further, the special circumstances pertaining to the property must be such that the property is distinct in character from comparable nearby properties. In *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], the landowner obtained a zoning variance to build a 93-space mobilehome park on 28 acres in Topanga Canyon on property zoned for light agricultural and single-family residences. (*Id.* at p. 510.) Applying Government Code section 65906,[11] *Topanga* found

---

[10] The City's zoning ordinance, Los Angeles Municipal Code section 12.27.D.1 to 5, is virtually identical. (See *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916 [8 Cal.Rptr.3d 178] (*Stolman*).)

[11] Government Code section 65906 provides, "Variances from the terms of the zoning ordinances shall be granted only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification. [¶] Any variance granted shall be subject to

insufficient evidence supported the grant of the variance because there was no evidence concerning comparable neighborhood properties, and therefore concerning whether the variance was necessary to bring the landowner into parity with other parties holding property in the same area. (11 Cal.3d at p. 521.)

Here, substantial evidence supports the City's findings that enforcement of the three-foot setback requirement would impose a substantial hardship on the property because of its unusual circumstances, and that there is a safety need for a variance from the 42-inch fence height limitation. The property possesses a unique hardship because it is a three-parcel site with no real backyard; all of the property faces the winding street. Much of this yard is below grade, rendering enforcement of the three-foot setback problematic.

Further, the property sits below grade on a winding street, and enforcing the requirement would create a greater hazard by providing a gap between the wall and yard into which persons and debris could fall. The fact that other properties in the area may have a similar below-grade configuration and do not have such fences does not detract from the necessity of ameliorating the substantial safety hazard which would remain if the City strictly enforced the setback requirement.[12]

In addition, contrary to the Committee's assertion, the City complied with Los Angeles Administrative Code former section 22.132, which provided that "[n]o permit for demolition, substantial alteration or relocation of any building, structure or site contained in said list shall be issued, and no such site, building or structure shall be . . . substantially altered . . . without first referring the matter to the [City's Cultural Heritage] Commission. . . ." This provision does not require that matters first be presented to the cultural heritage commission before an exception to the HSP can be granted; rather it provides that they shall be referred before a *permit* is granted. Currently, the cultural heritage commission holds veto power over any proposed fence because the exception so provides. Therefore, nothing in the municipal code

---

such conditions as will assure that the adjustment thereby authorized shall not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated."

[12] *Stolman,* upon which the Committee relies, addressed purely economic hardship, and is not pertinent to our analysis. *Stolman* applied Los Angeles Municipal Code section 12.27.D. to a gas station seeking a variance to permit a nonconforming use, an auto detailing business. (*Stolman, supra,* 114 Cal.App.4th at pp. 919–920.) The gas station, built in 1922, operated in what was otherwise a single-family residential area in Santa Monica Canyon. (*Id.* at p. 919.) The trial court had found that strict application of the zoning rules would require the gas station to cease operating if it were required to sell only gas. (*Id.* at p. 921.) *Stolman* found insufficient evidence of hardship because the gas station owner testified that although he made only eight cents a gallon on the gasoline sold, there was no evidence concerning the volume sold and whether such volume was so low as to constitute an "unnecessary hardship." (*Id.* at pp. 925–926.)

supports the Committee's argument that the proceedings were "backwards" because the matter was not presented first to the commission.

The Committee's argument that the City did not comply with the HSP is circular. The request for and granting of an exception assumes the HSP has been violated. The issue therefore becomes whether the City complied with the Los Angeles Municipal Code in granting the exception. The Committee's factual arguments concerning whether the curb is in the right-of-way and therefore in violation of the HSP are inconsequential to our conclusion.

■ Finally, the Committee argues that because Cutler bought the property with knowledge of the issues associated with the fence, any hardship here is self-inflicted and the City improperly granted an exception. (See *City of San Marino v. Roman Catholic Archbishop* (1960) 180 Cal.App.2d 657, 672–673 [4 Cal.Rptr. 547] (*City of San Marino*).) We disagree. In *City of San Marino*, the property owner purchased property zoned for residential use and then sought a zoning variance in order to build a rectory, parking lot, and playground. (*Id.* at p. 673.) *City of San Marino* concluded the hardship was self-inflicted, and denied the variance, noting that "[o]nly that type of hardship which inheres in the particular property is recognized . . . ." (*Id.* at p. 673.) Here, the hardship is not self-inflicted because the hardship inheres in the topography of the property, and this circumstance does not change with ownership.

## II. *THE CITY ERRED IN RELYING ON A CATEGORICAL EXEMPTION.*

The Committee contends the City erred in relying on a categorical exemption because permitting the owners to attach the fence to a historical monument was not a minor alteration of a land use limitation; further, even if the exemption could apply, it would not here because the fence had a strong possibility of having an adverse impact upon the historic monument. We agree.

■ To achieve its objectives of environmental protection, CEQA has a three-tiered structure. (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612]; see also Cal. Code Regs., tit. 14, § 15002, subd. (k) [describing three-step process].) First, if a project falls into an exempt category, or " 'it can be seen with certainty that the activity in question will not have a significant effect on the environment' [citation], no further agency evaluation is required." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) Second, if there is a possibility the project will have a significant effect on the environment, the agency must undertake an initial threshold study; if that study indicates that the project will not have a significant effect, the agency may issue a negative

declaration. Finally, if the project will have a significant effect on the environment, an environmental impact report (EIR) is required. (*Ibid.*)

The CEQA Guidelines[13] provide for 33 classes of projects that generally do not have a significant effect on the environment and therefore may be exempted from CEQA review. (Pub. Resources Code, § 21080, subd. (b); *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1191 [61 Cal.Rptr.2d 447] (*Azusa Land*).) The exemption at issue here, a class 5 exemption, exempts projects that "consist[] of minor alterations in land use limitations in areas with an average slope of less than 20%, which do not result in any changes in land use or density, including but not limited to: [¶] (a) Minor lot line adjustments, side yard, and set back variances not resulting in the creation of any new parcel . . . ." (CEQA Guidelines, § 15305.)

■ Even if an activity fits within an otherwise exempt category, the agency may not find it exempt if the project will have a significant effect on the environment due to unusual circumstances. (CEQA Guidelines, § 15300.2, subd. (c).)[14] Under that guideline, a two-step process is followed to determine whether an exception applies. The evaluation considers whether the circumstances of the particular project (i) differ from the general circumstances of projects covered by a particular categorical exemption, and (ii) those circumstances create an environmental risk that does not exist for the general class of exempt projects. (*Azusa Land, supra*, 52 Cal.App.4th at p. 1207.)

■ Furthermore, a categorical exemption is not applied to projects that may cause a substantial adverse change in the significance of a historic resource. (Pub. Resources Code, § 21084, subd. (e); Guidelines, § 15300.2, subd. (f).) Categorical exemptions also do not apply where the cumulative impact of successive projects of the same type in the same place over time may be significant. (CEQA Guidelines, § 15300.2, subd. (b).)

■ The agency decides whether a project is categorically exempt as a part of its preliminary review without reference to any mitigation measures. (*Azusa Land, supra*, 52 Cal.App.4th at pp. 1199–1200.) If the agency establishes the project is within an exempt class, the burden shifts to the party challenging the exemption to show that it falls into one of the exceptions. (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1259 [89

---

[13] All references herein to the CEQA Guidelines are to California Code of Regulations, title 14, section 15000 et seq. developed by the Office of Planning and Research and adopted by the California Resources Agency. (Pub. Resources Code, § 21083, former § 21087.)

[14] Guidelines, section 15300.2, subdivision (c) provides, "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."

Cal.Rptr.2d 233].) Generally, courts apply the substantial evidence test to the agency's factual determination that the exemption applies in the first instance; courts are divided on the question of whether the "fair argument" standard (whether the record contains evidence of a fair argument that the project may have a significant effect on the environment) (see *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 262 [42 Cal.Rptr.3d 537]), or the substantial evidence test applies to the second step of the analysis, namely determination of whether an exception to the exemption exists.[15] We do not substitute our judgment for that of the state agency and must resolve reasonable doubts in favor of its decision. (*Meridian Ocean Systems, Inc. v. State Lands Com.* (1990) 222 Cal.App.3d 153, 170 [271 Cal.Rptr. 445].)

■ The City found the fence exempt because allowing it constituted a minor alteration to a land use limitation. The record does not demonstrate, however, that the City had evidence to support the exemption and shift the burden to the challenger. First, the record is unclear whether fenceposts will be drilled into the curb or the wall; whether the curb is part of the historic resource; and whether the proposed fence will harm the physical stability of the wall. Additionally, the City conceded in its findings that a fence higher than 42 inches would impair the scenic view of the granite wall from nearby streets, and the City therefore erred in failing to consider the impact of granting an exception from the height limitations of the municipal code.

Second, the City failed to consider whether the circumstances of this project, namely the fence, differ from the general circumstances of projects covered by the exemption, and whether those circumstances create an environmental risk that does not exist for the general class of exempt projects. The Committee presented evidence establishing that building a fence atop the stone wall is different from the typical "minor land use alternation" contemplated by the exemption because of the nature of the historical resource involved. The stone walls are old and unique; any change to them could significantly alter their physical composition. Finally, the building of a fence atop the wall will significantly impact the environment by altering the historic resource, both as to its physical integrity and its aesthetic appeal from the neighboring streets.

Therefore, because the City may not rely on an exemption from CEQA, it must proceed to the next step of the analysis and conduct an initial threshold study to see if the proposed fence will have a significant impact upon the environment to determine whether a negative declaration may be issued.

---

[15] (See *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 796 [124 Cal.Rptr.2d 731] [applying the more deferential substantial evidence test].) We need not decide that issue, here, however, as the result is the same under either test.

## DISPOSITION

The judgment of the superior court is affirmed in part and reversed in part. The trial court is directed to grant Committee's petition for a writ of mandamus and require the City to vacate its issuance of an exemption under CEQA. In all other respects, the judgment granting an exception to the HSP is affirmed. The parties are to bear their own costs on appeal.

Perluss, P. J., and Wiley, J.,[*] concurred.

A petition for a rehearing was denied April 1, 2008, and the petition of respondent City of Los Angeles for review by the Supreme Court was denied July 9, 2008, S163437.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.