Filed 6/17/16 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| PEOPLE FOR PROPER PLANNING, | |
| Plaintiff and Appellant, | E062725 |
| v. | (Super.Ct.No. PSC1301691) |
| CITY OF PALM SPRINGS et al., | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed herein on April 22, 2016, and ordered partially published on May 20, 2016, is modified as follows:

1. On page 8, strike the entire first full paragraph beginning "The agency decides" and ending "(*Azusa*, *supra*, 52 Cal.App.4th at p. 1192.)" Footnote 3 is also deleted. The following paragraph is inserted in place of the deleted paragraph:

> The agency decides whether a project is categorically exempt as a part of its preliminary review without reference to any mitigation measures. [Citation.] . . . Generally, courts apply the substantial evidence test to the agency's factual determination that the exemption applies in the first instance . . . ." (*Committee to Save Hollywoodland*, *supra*, 161 Cal.App.4th at pp. 1186-1187, fn. omitted.) "As to projects that meet the requirements of a categorical exemption, a party challenging the exemption has the burden of producing evidence supporting an exception. [Citations.]" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086,

1

1105; Cal. Code Regs., tit. 14, § 15300.2, subd. (c) ["A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."].)  The plain language of Guidelines section 15300.2, subdivision (c), requires that a potentially significant effect must be "due to unusual circumstances" for the exception to apply.  In reviewing an agency's decision with respect to the unusual circumstances exception, "both prongs of [Public Resources Code] section 21168.5's abuse of discretion standard apply . . . .  The determination as to whether there are 'unusual circumstances' [citation] is reviewed under [Public Resources Code] section 21168.5's substantial evidence prong.  However, an agency's finding as to whether unusual circumstances give rise to 'a reasonable possibility that the activity will have a significant effect on the environment' [citation] is reviewed to determine whether the agency, in applying the fair argument standard, 'proceeded in [the] manner required by law.' [Citations.]" (*Berkeley Hillside Preservation v. City of Berkeley*, *supra*, 60 Cal.4th at p. 1114.)  When an agency relies on a categorical exemption, the exemption must be narrowly construed.  (*Azusa*, *supra*, 52 Cal.App.4th at p. 1192.)

2.  At the end of the sentence commencing at the bottom of page 9 with "Notwithstanding the above" and ending with "exceptions to exemption," add the following footnote 3:

[3] The City does not dispute that this case presents "unusual circumstances."

There is no change in the judgment.

HOLLENHORST
Acting P. J.

I concur:

SLOUGH
              J.

Filed 4/22/16; part. pub. order 5/20/16 (see end of opn) (unmodified version)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| PEOPLE FOR PROPER PLANNING, | |
| Plaintiff and Appellant, | E062725 |
| v. | (Super.Ct.No. PSC1301691) |
| CITY OF PALM SPRINGS et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County. John G. Evans, Judge. Reversed with directions.

Law Office of Babak Naficy and Babak Naficy for Plaintiff and Appellant.

Woodruff, Spradlin & Smart, David A. DeBerry and Ricia R. Hagar for Defendants and Respondents.

Plaintiff and appellant People for Proper Planning (PFPP) appeals from the judgment denying its petition for peremptory writ of mandate and complaint for declaratory and injunctive relief filed against defendants and respondents City of Palm

1

Springs and Palm Springs City Council (herein collectively referred to as City). In its petition, PFPP challenged the City's adoption of Resolution No. 23415, which approved an Amendment to the City's General Plan (Amendment) removing the minimum density requirements for each residential development. The trial court denied PFPP's challenge, and it appeals, contending that the Amendment (1) is not exempt from the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) because it is not a minor land use alteration; (2) is inconsistent with the General Plan (General Plan), such that it now makes the General Plan internally inconsistent; and (3) violates statutory requirements that the City accommodate its fair share of regional housing needs for all income levels, including low and very low income levels. For the reasons stated herein, we determine the Amendment is not exempted from CEQA requirements, and thus, reverse the judgment. In light of this determination, we need not address the other issues raised by PFPP.

## I. PROCEDURAL BACKGROUND AND FACTS

PFPP is, according to its complaint, a California nonprofit membership organization "whose objective is to promote planning and development in Palm Springs in conformity with all applicable laws and regulations." Prior to September 4, 2013, the City's General Plan, in some parts, designated a minimum and maximum density of residential units allowed in each land use category. For example, a high density designation allowed for a range of "15.1 to 30" dwelling units per acre, while a medium density designation allowed for a range of "6.1 to 15" dwelling units per acre. In other

2

parts, the General Plan did not set a lower end of the range, but rather simply provided for a high density of "30" dwelling units per acre, or a medium density of "22" dwelling units per acre. The General Plan explained that "[e]ach of the residential land use designations includes a range of allowable densities. The maximum density signifies the maximum number of dwelling units per gross acre that are allowed in each residential area," while "[t]he lower threshold figure for each of these categories represents a minimum amount of development *anticipated*, provided that all other required conditions can be met." (Italics added.)

While the General Plan sets forth the City's "permitted density of residential development . . . the Zoning Ordinance provides specific guidance on applicable development standards." Thus, the zoning ordinance provides for the property development standards in residential zones, including the minimum lot, yard and building standards. In reference to planned residential development districts, the zoning ordinance provides that such a district "may include a multiplicity of housing types; provided, the density does not exceed the general plan requirements," and "[t]he form and type of development on the [planned development] site boundary shall be compatible with the existing or potential development of the surrounding neighborhoods." Thus, within a specific General Plan category, there are often several different zoning categories that dictate development standards and actual density allowances.

In 2013, the City sought to amend its General Plan to eliminate minimum density requirements for all residential land use categories, based on the planning commission

3

staff report's recommendation. The City held a public hearing on the proposed Amendment. PFPP opposed the proposed Amendment. On September 4, 2013, by a vote of 3 to 2, the City adopted Resolution No. 23415, which amended the General Plan by removing any reference to minimum density requirements for each residential development. According to Resolution No. 23415, "the past and current practice of the City, including without limitation, the City Council, the Planning Commission, and the Director of Planning, is to consider only the maximum density allowed within each land category and consider and approve lower density project[s.]" The City concluded the change was exempt from CEQA based on a categorical exception.

On October 9, 2013, PFPP filed a petition for peremptory writ of mandate and complaint for declaratory and injunctive relief, seeking to set aside the City's approval of the Amendment on the grounds it is "inconsistent with the General Plan and violates Government Code [section] 65863, which prohibits cities and counties from reducing residential densities or allowing residential development of any parcel at lower residential densities absent certain findings not made here." The City answered the petition and both sides submitted briefs to the trial court. A hearing was held on November 7, 2014. After taking the matter under submission, the trial court denied the petition.[1]

---

[1] The trial court found that the elimination of the minimum density limits in the General Plan merely conformed "the density ranges in the General Plan to the City's practice relative to the General Plan's actual treatment of zoning density and the zoning ordinance." The court noted that the Amendment did not violate Government Code section 65863 because it "creates no change in the standards applied to project approvals
*[footnote continued on next page]*

4

## II.  DISCUSSION

### A  Standard of Review

Generally, an appellate court reviewing a trial court's ruling on a petition for writ of mandate is confined to inquiring whether the findings and judgment of the trial court are supported by substantial evidence.  Nevertheless, an appellate court must independently decide questions of law without deference to the trial court's conclusions.  (*Evans v. Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407; *Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 53.)

Examples of questions of law relevant to this appeal include (1) determining the meaning of a statute (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432), and (2) determining the meaning of a provision of a general plan because a charter city's adoption of such plan is a legislative act (Gov. Code, § 65700, subd. (a); see *Chandis Securities Co. v. City of Dana Point* (1996) 52 Cal.App.4th 475, 481).  Although a trial court's conclusions on questions of law are not entitled to deference, "the City's legislative enactments are entitled to some deference; there is a presumption that both the

---

*[footnote continued from previous page]*

because the governing zoning ordinances, which include no lower limits, are unchanged."  Finally, the court concluded that PFPP had failed to show a "reasonable possibility of an adverse environmental impact sufficient to remove the project from the categorically exempt class," because the "'baseline' or existing environment," i.e., the manner in which residential densities were treated prior to the Amendment, "was that the City had never interpreted the General Plan to mandate minimum densities and the zoning ordinance, under which all residential development is processed, had not during any relevant time period mandated minimum densities."

general plan and the initiative measures amending such are valid [citation], and so long as reasonable minds might differ as to the necessity or propriety of the enactment, the municipality's (or electorate's) determination of policy must be upheld. [Citation.] The only issue to be resolved is whether, applying the standard that the legislation, unless clearly arbitrary, capricious, or entirely lacking in evidentiary support, must be upheld [citation], the general plan, as amended, substantially complies with state law, i.e., whether there has been '"actual compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from "mere technical imperfections of form." [Citation.]' [Citation.]" (*Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 292, disapproved on other grounds as stated in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11.)

**B. The City Erred in Relying on a Categorical Exemption**

PFPP contends the City erred by relying on a categorical exemption because the Amendment is not a minor alteration of a land use limitation; furthermore, even if the exemption could apply, it would not here because the Amendment has a strong possibility of having an adverse impact on the environment. We agree.

"To achieve its objectives of environmental protection, CEQA has a three-tiered structure. [Citations.] First, if a project falls into an exempt category, or '"it can be seen with certainty that the activity in question will not have a significant effect on the environment" [citation], no further agency evaluation is required.' [Citation.] Second, if there is a possibility the project will have a significant effect on the environment, the

6

agency must undertake an initial threshold study; if that study indicates that the project will not have a significant effect, the agency may issue a negative declaration. Finally, if the project will have a significant effect on the environment, an environmental impact report (EIR) is required. [Citation.]" (*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1185-1186 (*Committee to Save the Hollywoodland*).)

Here, the City never undertook an initial threshold study because it found the Amendment to fall into an exempt category. "The Legislature has made certain categories of projects exempt from CEQA. Many of these exemptions appear in Public Resources Code section 21080, subdivision (b). [Citations.] Public Resources Code section 21080, subdivision (b)(9) exempts from CEQA '[a]ll classes of projects designated pursuant to [Public Resources Code] [s]ection 21084.' [¶] Public Resources Code section 21084 authorizes the Secretary of Resources Agency to include in the Guidelines[2] a list of classes of projects exempt from CEQA provided the Secretary makes 'a finding that the listed classes . . . do not have a significant effect on the environment.' The classes of projects identified by the Secretary of the Resources Agency appear in Guideline section 15300 et seq. and are sometimes referred to as

---

2 CEQA Guidelines (Cal. Code of Regs., tit. 14, §§ 15000 et seq.) developed by the Office of Planning and Research and adopted by the California Resources Agency. (Pub. Resources Code, § 21083.)

7

'categorical exemptions.'" (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1191 (*Azusa*).)

"The agency decides whether a project is categorically exempt as a part of its preliminary review without reference to any mitigation measures. [Citation.] If the agency establishes the project is within an exempt class, the burden shifts to the party challenging the exemption to show that it falls into one of the exceptions. [Citation.] Generally, courts apply the substantial evidence test to the agency's factual determination that the exemption applies in the first instance; courts are divided on the question of whether the 'fair argument' standard (whether the record contains evidence of a fair argument that the project may have a significant effect on the environment) [citation], or the substantial evidence test applies to the second step of the analysis, namely determination of whether an exception to the exemption exists.[3] We do not substitute our judgment for that of the state agency and must resolve reasonable doubts in favor of its decision. [Citation.]" (*Committee to Save Hollywoodland*, *supra*, 161 Cal.App.4th at pp. 1186-1187, fn. omitted.) When an agency relies on a categorical exemption, the exemption must be narrowly construed. (*Azusa*, *supra*, 52 Cal.App.4th at p. 1192.)

The City found the Amendment to be exempt from CEQA review. The exemption at issue here, a class 5 exemption, exempts projects that "consist[] of minor alterations in land use limitations in areas with an average slope of less than 20%, which *do not result*

___

**3** We need not decide that issue here, however, as the result is the same under either test.

8

*in any changes in land use or density*, including but not limited to: [¶] (a) Minor lot line adjustments, side yard, and set back variances not resulting in the creation of any new parcel; [¶] (b) Issuance of minor encroachment permits; [¶] (c) Reversion to acreage in accordance with the Subdivision Map Act." (Cal. Code Regs., tit. 14, §§ 15000 et seq. (CEQA Guidelines), 15305, italics added.) The City found the Amendment exempt because its "proposed change reflects past and current practice and retains existing density maximum standards." The trial court agreed. We do not.

Because the Amendment does not retain existing density minimum standards on its face, it apparently results in a change to land density. The City's argument to the contrary discounts minimum density standards on the ground that the General Plan qualifies that minimum number as "anticipated." Moreover, the City argues that the Amendment "did not alter any language in the Housing Element or any tables either in the Land Use Element or Housing Element"; that "[i]t did not alter estimates of housing stock with the Housing Element"; and "[t]he ranges of density were left alone in some places as they still remain useful in noting the minimums that can be anticipated and continue to give meaning to the General Plan's description of the lower threshold." In sum, the City's argument is that the Amendment did not result in a change to land density.

Notwithstanding the above, even if we accepted the City's argument and assumed the Amendment qualified as a class 5 exemption, we conclude that PFPP met its burden of showing that the Amendment falls into one of the exceptions to exemption. PFPP

9

presented sufficient evidence supporting a fair argument that the Amendment will result in a significant impact on the environment due to its across-the-board change in land use regulation that affects every residential area identified by the General Plan. Moreover, the Amendment is capable of causing significant cumulative impacts on the City's stock of high-density, low and moderate income housing due to its elimination of the minimum density allowances. In order to evaluate how the Amendment will impact the environment, we begin with the EIR that was prepared in support of the 2007 General Plan (2007 EIR).

According to the 2007 EIR, residential land uses accounted for approximately 41 percent of the urban and developed land uses within the City, with only 3 percent of total acreage designated for high density. In support of the 2007 General Plan update, which set the anticipated range of density, the City identified the following policies and actions that were designed to reduce potential land use and planning impacts of future development. Regarding land use, the City sought to "[e]ncourage, where appropriate, high density projects to maximize the use of land." As for the housing element, the City wanted to encourage a broad range of housing opportunities, "[m]aintain a range of housing densities through general plan land use designations and zoning to facilitate and encourage single-family homes, apartments and townhomes, mobile homes, and special needs housing," facilitate the development of affordable housing, and "[p]rohibit the encroachment of significant housing development into areas designated as open space, desert, or conservation areas without appropriate environmental review and approvals."

10

The 2007 EIR noted that the housing element of the General Plan update "provides a thorough discussion as well as goals and policies to address issues of housing affordability." Recognizing that Government Code section 65863 "restricts cities' ability to reduce the maximum allowable density in areas already designated or zoned for residential uses to a level below the density used by the [state] when determining whether a city's housing element complies with state law," the 2007 EIR noted that the City could not permit the "reduction of density of any such residentially designated parcel unless the city finds the proposed reduction in density is consistent with the General Plan," and there are remaining sites adequate to accommodate the City's share of the regional housing needs. While the Amendment does not reduce the maximum allowable density for residential areas, its elimination of the minimum allowable density changes the density range, effecting a lower average density for residential areas than that anticipated in the 2007 EIR. The City's claim that the Amendment is exempt from CEQA analysis begs the question: Is the City able to accommodate its share of the regional housing needs if there is no minimum (and a lower average) density for residential areas as originally identified and required in the General Plan?

According to the City, the minimum density identified in the General Plan is irrelevant because it was never really considered. It contends that the "'baseline' or existing environment" remains unchanged given the City's practice of never interpreting the General Plan as mandating minimum densities, and the Zoning Ordinance (under which all residential development is processed) as never mandating minimum densities.

The City adds that this was the existing environment when the General Plan was adopted in 2007 and will remain so with the Amendment. The trial court agreed, finding the Amendment did not change the existing environmental baseline. We are not persuaded.

While we agree that the physical environmental conditions in the vicinity of the project normally constitute what is known as the baseline (Cal. Code Regs., tit. 14, §§ 15000 et seq. (CEQA Guidelines), 15125, subd. (a)), we do not agree that such is the case here. Once the City adopted the General Plan in 2007, the General Plan itself provided the baseline for future projects. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 125-126 ["[W]here the issue involves an impact on traffic levels, the EIR might necessarily take into account the normal increase in traffic over time. Since the environmental review process can take a number of years, traffic levels as of the time the project is approved may be a more accurate representation of the existing baseline against which to measure the impact of the project."].) Here, the City is required to accommodate its share of the regional housing needs. The 2007 EIR identified closed density ranges that met this requirement. By eliminating the minimum density, the Amendment will impact the availability of high density, low and moderate income housing because high density designated parcels may now be considered for low-density development. Thus, the Amendment lowers the average density for residential areas and changes the land use regulation to the detriment of every parcel designated as residential by the General Plan, potentially causing significant cumulative impacts on the City's stock of high density, low and moderate

12

income housing. Moreover, permitting low density residential development in areas previously set aside for high density projects will necessarily reduce the range of housing types, prices and opportunities available in the City to the frustration of the General Plan's goal of facilitating a broad range of housing types. The City recognized that the Amendment embraces a trend towards low density, small lot single-family dwellings. Thus, arguably, the Amendment changes the diversity of residential densities established in General Plan. Given this change, it is unclear whether the City will be able to accommodate its share of the regional housing needs.

Further, we find the City's reliance on its zoning ordinance as providing guidance on "whether the [Amendment] ha[s] the potential to reduce residential densities" to be misplaced. As the City acknowledges, the zoning ordinance sets no minimums on residential density. However, the General Plan does. The General Plan is a "'"constitution" for future development' [citation] located at the top of 'the hierarchy of local government law regulating land use' [citation]." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 772-773.) "A zoning ordinance is consistent with the city's general plan where, considering all of its aspects, the ordinance furthers the objectives and policies of the general plan and does not obstruct their attainment. [Citation.] . . . . [¶] . . . [¶] . . . 'A zoning ordinance that is inconsistent with the general plan is invalid when passed [citations] and one that was originally consistent but has become inconsistent must be brought into conformity with the general plan. [Citation.] The Planning and Zoning Law does not contemplate that general plans will be amended to conform to zoning

13

ordinances.  The tail does not wag the dog.  The general plan is the charter to which the ordinance must conform.' [Citation.]  The same rule applies to this case." (*City of Irvine v. Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 879.)

Given the above, we conclude that the City may not rely on an exemption from CEQA, it must proceed to the next step of the analysis and conduct an initial threshold study to see if the proposed Amendment will have a significant impact upon the environment to determine whether a negative declaration may be issued.  (See *Committee to Save Hollywoodland*, *supra*, 161 Cal.App.4th at p. 1187.)

## III.  DISPOSITION

The judgment is reversed.  The trial court is directed to grant PFPP's petition for a writ of mandamus and require the City to vacate both its issuance of an exemption under CEQA concerning the Amendment, and its September 4, 2013, Resolution No. 23415 certifying and approving the Amendment.  PFPP is awarded its costs on appeal.


                    HOLLENHORST
                                         J.

We concur:


    RAMIREZ
                       P.J.

    SLOUGH
                       J.

14

Filed 5/20/16

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| PEOPLE FOR PROPER PLANNING, | |
| Plaintiff and Appellant, | E062725 |
| v. | (Super.Ct.No. PSC1301691) |
| CITY OF PALM SPRINGS et al., | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| Defendants and Respondents. | |

A request having been made to this court pursuant to California Rules of Court, rule 8.1120(a) for publication of a nonpublished opinion heretofore filed in the above-entitled matter on April 22, 2016, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c);

IT IS ORDERED that said opinion be certified for partial publication pursuant to California Rules of Court, rule 8.1105(b). The opinion filed in this matter on April 22, 2016, is certified for publication in full with the following exception: Omit the first full paragraph commencing on page 13 beginning with "Further, we find the City's reliance" and ending at the top of page 14 with the citation "(*City of Irvine v. Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 879.)"

HOLLENHORST
                      J.

We concur:
    RAMIREZ
                P. J.
    SLOUGH
                J.