Filed 11/23/15; on transfer from Supreme Ct.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITIZENS FOR ENVIRONMENTAL RESPONSIBILITY et al., | C070836 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201180000902CUWMGDS) |
| v. | |
| STATE OF CALIFORNIA ex rel. 14TH DISTRICT AGRICULTURAL ASSOCIATION et al., | OPINION ON REMAND |
| Defendants and Respondents; | |
| STARS OF JUSTICE, INC., | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Lloyd G. Connelly, Judge. Affirmed.

Lozeau|Drury, Michael R. Lozeau, Richard T. Drury, Christina Caro, and Douglas J. Chermak, for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Randy L. Barrow and Matthew J. Goldman, Deputy Attorneys General, for Defendants and Respondents.

No appearance by Real Party in Interest and Respondent Stars of Justice, Inc.

The trial court denied a petition for writ of mandate and complaint for declaratory and injunctive relief filed by appellants Citizens for Environmental Responsibility, Stop The Rodeo, and Eric Zamost, under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)[1] Appellants claim the 14th District Agricultural Association and its Board of Directors (collectively District) violated CEQA by approving a notice of exemption (NOE) from environmental review for a rodeo held by real party in interest Stars of Justice, Inc., at the Santa Cruz County Fairground (Fairground) in Watsonville in October 2011.[2] The exemption was pursuant to CEQA's regulatory guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (hereafter Guidelines)) for a Class 23 categorical exemption for "normal operations of existing facilities for public gatherings." (Guidelines, § 15323).[3] Appellants contend the exemption is inapplicable because (1) the rodeo project expressly included mitigation measures in the form of a Manure Management Plan, in effect acknowledging potential environmental effects, and (2) the unusual circumstances exception to categorical exemptions applies because storm

---

[1] Undesignated statutory references are to the Public Resources Code.

[2] Since the rodeo has already taken place, the appeal is moot, but we exercise our discretion to address the appeal anyway, because it presents an issue of broad public interest that is likely to recur and capable of evading review. (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479-480.)

[3] "Class 23 consists of the normal operations of existing facilities for public gatherings for which the facilities were designed, where there is a past history of the facility being used for the same or similar kind of purpose. For the purposes of this section, 'past history' shall mean that the same or similar kind of activity has been occurring for at least three years and that there is a reasonable expectation that the future occurrence of the activity would not represent a change in the operation of the facility. Facilities included within this exemption include, but are not limited to, racetracks, stadiums, convention centers, auditoriums, amphitheaters, planetariums, swimming pools, and amusement parks." (Guidelines, § 15323.)

water runoff flows over the Fairground where cattle and horses defecate and into an already polluted creek.  (Guidelines, § 15300.2, subd. (c).)[4]

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Fairground and the Salsipuedes Creek

The District administers the Fairground which, since 1941, has been the venue for various events, including equestrian and livestock events and the annual county fair.  The Fairground is zoned as a public and community facility.  It is bordered on three sides by land zoned for agricultural use.  On the eastern side it is bordered by land zoned for residential use.  The Fairground has three livestock barns and a livestock arena in the southeastern area.  In the north/northeastern area, it has a horse barn, cattle and horse stalls, and three horse arenas.  The Fairground is located in the Corralitos/Salsipuedes watershed.  The Corralitos Creek is a tributary to Salsipuedes Creek.  The Salsipuedes Creek flows adjacent to and through a portion of the north/northeast area of the Fairground where the horse and cattle stalls, horse barn and horse arenas are located.

### The First Rodeo Proposal

In the fall of 2009, the Santa Cruz County Deputy Sheriff's Association, acting through its nonprofit corporation Stars of Justice, proposed a three-day "ProRodeo" for October 2010 to raise funds to support programs for children.  The application proposed improvements to the Fairground facilities and contemplated future rodeos.  Some citizens opposed the ProRodeo on various grounds, including CEQA and cruelty to animals.  The District's board of directors initially approved the ProRodeo in June 2010, concluding the

---

[4] Guidelines section 15300.2, subdivision (c), provides, "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*."  (Italics added.)

project was exempt from CEQA review under Class 23, normal operations of facilities for public gatherings, but the contract was later revoked in July 2010 due to disagreements between the Fair manager and the Stars of Justice.

**Creek Contamination and Fairground Monitoring**

In 2009, unrelated to the first proposed rodeo, the California Regional Water Quality Control Board for the Central Coast Region (Regional Water Board) determined the water quality of both the Corralitos and Salsipuedes Creeks was impaired due to human and animal fecal coliform. As we discuss *post*, Regional Water Board staff determined that the likely sources were storm drain discharges, homeless persons' encampments, pet waste, sanitary sewer systems (septic tanks), and farm animals and livestock operations -- including Fairground activities.

To restore the water quality, the Regional Water Board established and allocated responsibilities for achieving a total maximum daily load for fecal coliform in the creeks and imposed prohibitions on the discharge of animal and human fecal material, approved by the State Water Resources Control Board (the State Board) and the United States Environmental Protection Agency (EPA). The Regional Water Board required owners and/or operators to use specific management practices to control discharges containing fecal matter and to monitor and report their progress. The resolution adopted by the Regional Water Board did not specify the Fairground but instead allocated responsibility to "Owners of Land Used for/Containing Farm Animals/Livestock."

In December 2010, the Fairground began a voluntary stream water monitoring program to identify contaminants in Salsipuedes Creek flowing from upstream, through the Fairground property, and leaving the property flowing downstream. As will be discussed in more detail *post*, "grab samples" showed that the amount of E. coli in the water leaving the Fairground and flowing downstream was substantially less than the amount of E. coli entering the Fairground from upstream. Routine testing of drinking

4

water from a Fairground well in the equestrian area showed no contamination by coliform or E. coli.

## Ongoing Manure Management Practices at the Fairground

The Fairground had taken steps to manage manure produced during its equestrian and livestock events. Beginning in the 1960's, the Fairground removed manure and livestock bedding immediately after each event and collected it in a wooden bunker on a cement aggregate slab partially covered by a barn roof and, during the dry season, on a flat section of equestrian area. A contracted company hauled it to a composting facility. Since the early 1990's, the manure has been hauled away on a daily basis during equestrian and livestock events. These practices were not formalized in a written document until July 19, 2010, after appellants objected to the earlier, grander-scale rodeo proposed by Stars of Justice that ultimately did not take place. The written formalization of these past practices -- the Manure Management Plan or MMP -- calls for bunkers to be cleaned at the end of the event or when close to capacity.[5] The MMP also indicates, in addition to the storage and hauling provisions, that earth berms separate the drainage way in the equestrian area from the surroundings to prevent contamination from washing into the drainage way. Contamination is further minimized by harrowing or tilling the soil to promote filtration of rain water and by planting vegetation on areas with a slope of 15 percent or more, to prevent erosion and promote filtration of surface contaminants. The formal MMP was written approximately six months before Stars of Justice proposed the rodeo project that is the subject of this appeal.

---

[5] The District cites other documents indicating daily pickup, including a letter from a person associated with the Fairground and an informational handout for facility users with a memorandum suggesting that it be attached to the MMP.

**The Rodeo Project and the Notice of Exemption**

In January 2011, Stars of Justice proposed a scaled-down version of the rodeo for two days, October 1 and 2, 2011 (the rodeo project). Appellants opposed the rodeo project on environmental and other grounds, and the District's board scheduled a public hearing for April 2011. At that hearing, the board, out of an "abundance of precaution" and fear of lawsuits, considered whether to have an environmental review for the rodeo project conducted by environmental consultant Strelow Consulting, which was working on an unrelated project for the District. The board ultimately voted to have the consultant consider the applicability of the Class 23 categorical exemption to the rodeo. The consultant's analysis supported the exemption.

In May 2011, the board adopted the Class 23 NOE and approved the rental agreement for the rodeo. As described in the NOE, the event was to take place over the course of two days and was expected to attract about 1,500 spectators, involve a maximum of 500 horses but only 100 on the grounds at any given time, and involve a maximum of 250 cattle/stock with only 50 on the grounds at any given time.

The NOE said the rodeo project was categorically exempt under Guidelines section 15323, the Class 23 exemption for "normal operations of existing facilities for public gatherings for which the facilities were designed, where there is a past history of the facility being used for the same or similar kind of purpose." The NOE said the Fairground is an existing facility designed for public gatherings, primarily the annual county fair, but other public events are held throughout the year, including equestrian and livestock events. The county fair was established in 1885, and the District bought the current 105-acre fairground property with state funds in 1941. The first annual fair opened the same year and included a horse show. The Fairground includes three equestrian/livestock arenas and barns, most of which were constructed in 1941 with subsequent improvements. In 1971, a five-year plan for improvements of the horse show area was instituted, with construction of more stalls and cattle holding pens. The existing

6

equestrian facilities have been in existence for at least 50 years, and equestrian and livestock events have always been accommodated at the Fairground. On average, the facility has sponsored two to four equestrian or livestock shows per month for the past 25 to 30 years. In the 1970's, the Fairground hosted at least eight annual rodeos. More recently, in each of the last three years, about two dozen equestrian and/or livestock events have been held annually at the Fairground, in addition to the annual county fair. These events include horse shows and performances and livestock events, with attendance of 100 to 500 spectators for smaller events, 1,000 to 1,200 spectators for larger events, and 1,500 to 3,500 spectators for equestrian and livestock events held during the annual county fair. The smaller equestrian events have 50 to 400 horses. The annual cutting horse show at the Fairground has about 500 horses, 800 cattle, and 1,000 people -- similar to the proposed rodeo project.

The NOE noted the inapplicability of any of the regulatory exceptions to a categorical exemption. "The event will utilize existing arenas, horse barns and other facilities; no construction or physical alterations of the grounds are proposed. The proposed event would not result in impacts on a resource of critical concern (section 15300.2(a)).[6] A narrow segment of Salsipuedes Creek flows through the Fairground and the arena area and is mostly an earthen-channel devoid of vegetation within the arena location; a short segment flows through an underground pipeline culvert. Horse and livestock manure is strictly managed in accordance with the District's 'Manure Management Plan.' Manure is collected, contained in enclosed bunkers and hauled offsite, and animal washdown areas flow to the existing sanitary sewer. These required operations and management of the animals will prevent non-point source pollution into the creek and indirect impacts to the aquatic species that may be present. There are no

---

**6** This subdivision actually addresses only specified classes not including Class 23.

known significant cumulative impacts to which the project would contribute, i.e. successive projects of the same type in the vicinity (section 15300.2(b)). As there is no planned construction or alteration of the Fairground[] facilities or grounds, and with implementation of animal and manure management, no significant impacts are anticipated (section 15300(c)). Similarly, the project site is not adjacent to a designated scenic highway, and the project would not damage scenic resources (section 15300.2(d)). The site is not a hazardous waste site (section 15300.2(e)). No historical resources would be affected by the project (section 15300.2(f))."

**The Petition for Writ of Mandate and the Trial Court's Rulings**

On June 29, 2011, appellants filed in the trial court their petition for writ of mandate and complaint for injunctive and declaratory relief. On September 27, 2011, the trial court heard argument, took the matter under submission, and subsequently declined to prevent the rodeo from going forward the following week.

The rodeo took place, as planned, on October 1 and 2, 2011.

On January 24, 2012, the trial court issued its statement of decision. The trial court ruled that the evidence supported the factual findings that the rodeo project -- which was similar to the horse and livestock events -- was a normal activity of the Fairground, the Fairground is a facility for public gatherings designed for such activity, the Fairground has a past history of use for such activity, and the rodeo would not change the operation of the Fairground. The trial court said the MMP did not represent a new activity or operation requiring CEQA evaluation. "Rather, the [MMP] incorporated unwritten and ongoing practices evolved by Fairground staff since the 1960s to deal with a normal aspect of all the horse and livestock events historically held at the Fairground to avoid surface water contamination, control parasite and fly breeding, and protect public health. . . . Whether the practices described in the [MMP] are viewed as an integral component of those horse and livestock events or as an ongoing activity of the Fairground necessitated by the horse and livestock events, the plan practices constituted a

8

standard part of normal Fairground operations." The court added that the MMP did not constitute a newly proposed mitigation measure precluding the Class 23 exemption. The MMP has been part and parcel of normal Fairground operations for decades. The court said that mention of the MMP in the portion of the NOE explaining the reasons for exempting the rodeo project, rather than in the portion describing the project, did not impermissibly split the project into separate pieces to evade review.

The trial court ruled that the exemption exception, involving situations where there is a "reasonable possibility" that the activity will have a "significant effect" on the environment "due to unusual circumstances," did not apply. (Guidelines, § 15300.2, subd. (c); see fn. 4, *ante*.) The trial court found no "unusual circumstances" under a substantial evidence standard. The trial court rejected appellants' arguments that proximity to Salsipuedes Creek, proximity to residential and agricultural land, or a public safety risk of bull riding constituted unusual circumstances. The trial court continued that, even if there were unusual circumstances, appellants had failed to show a "significant effect" on the environment under the "fair argument" standard.

On the issue of "significant effect," the trial court expressly rejected appellants' heavy reliance on the Regional Water Board report, which discussed the likely sources of fecal coliform. The court noted that the report "contained no water sampling results to establish that storm water discharges or runoff from the Fairground was actually contributing fecal material to Salsipuedes Creek. Nor did the report show any awareness of the Fairground's [MMP] designed to collect manure from horses and livestock participating in Fairground events. The report merely noted that the Fairground hosted a number of farm animal events throughout the year and that Regional Water Board staff, when surveying the area, had observed a single horse but no management measures on the Fairground to prevent storm water runoff from the 'manure area' from entering surface waters of Salsipuedes Creek. [Citation.] The report did not indicate what was meant by 'manure area,' that the Regional Water Board staff had observed manure in that

9

area, or that they had contacted Fairground staff about the existence and implementation of manure management measures. Evidently, Regional Water Board staff had surveyed the Fairground at a time when no horse or livestock show was being held, hence there was no manure to manage, and no need for implementation of the Fairground's [MMP]."

The trial court also ruled that the exemption exception involving situations where "the cumulative impact of successive projects of the same type in the same place, over time is significant" did not apply. (Guidelines, § 15300.2, subd. (b).) The court reasoned that appellants' reliance on vague plans of the Deputy Sheriff's Association to hold five future rodeos at unspecified times and unspecified locations was speculative.

The trial court also rejected appellants' invocation of the exemption exception for projects on sites included in a list of hazardous waste sites (the Cortese list). (Guidelines, § 15300.2, subd. (e), citing Gov. Code, § 65962.5.) The Fairground had been on the list because of a 1991 leak of an underground gasoline tank. The trial court noted the Fairground's inclusion on that list was "annulled" in 1993 when the Health Services Agency determined from soil samples that no further assessment was needed.

On February 3, 2012, the trial court entered judgment in favor of the District and Stars of Justice.

## DISCUSSION

### I. CEQA Overview

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) It is to be interpreted " 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Ibid.*) "By statute, the Legislature has . . . directed the Secretary of the Natural Resources Agency . . . to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA. (§ 21084, subd. (a).) 'In response to that mandate,' the Secretary 'has found' that certain 'classes of

10

projects . . . do not have a significant effect on the environment' and, in administrative regulations known as [G]uidelines, has listed those classes and 'declared [them] to be categorically exempt from the requirement for the preparation of environmental documents.' [Citations.]" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1091 (*Berkeley Hillside*).)

"The Guidelines establish a three-step process to assist a public agency in determining which document to prepare for a project subject to CEQA. (Guidelines, § 15002, subd. (k).) In the first step, the lead public agency preliminarily examines the project to determine whether the project is statutorily exempt from CEQA, falls within a Guidelines categorical exemption or if ' "it can be seen with certainty" that [the] project will not have a significant effect on the environment. [Citations.]' [Citation.] If so, no further agency evaluation under CEQA is required. The agency may prepare a notice of exemption. (Guidelines, §§ 15002, subd. (k)(1), 15062 . . . .) If, however, the project does not fall within an exemption and it cannot be seen with certainty that the project will not have a significant effect on the environment, the agency takes the second step and conducts an initial study to determine whether the project *may* have a significant effect on the environment. [Citations.] If the initial study shows there is no substantial evidence the project may have a significant effect on the environment or revisions to the project would avoid such an effect, the lead agency prepares a negative declaration. [Citations.] If the initial study shows 'there is substantial evidence . . . that the project may have a significant effect on the environment,' the lead agency must take the third step and prepare an environmental impact report (EIR)." (*California Farm Bureau Federation v. California Wildlife Conservation Bd*. (2006) 143 Cal.App.4th 173, 184 (*Cal. Farm Bureau*).)

The lead agency has the burden to demonstrate that a project falls within a categorical exemption and the agency's determination must be supported by substantial evidence. (*Cal. Farm Bureau*, *supra*, 143 Cal.App.4th at p. 185.) Once the agency

establishes that the project is exempt, the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2.  (*Cal. Farm Bureau*, at p. 186.)

## II.  The Manure Management Program

Appellants argue the MMP constitutes a mitigation measure for the rodeo project, precluding the Class 23 categorical exemption.  We disagree.

" 'An agency should decide whether a project is eligible for a categorical exemption as part of its preliminary review of the project without reference to or reliance upon any *proposed* mitigation measures.' "  (*Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1106 (*SPAWN*), italics added; see also *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1199 (*Azusa*).)

Under the Guidelines, "mitigation" includes:  "(a) Avoiding the impact altogether by not taking a certain action or parts of an action.  [¶]  (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.  [¶]  (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment.  [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.  [¶]  (e) Compensating for the impact by replacing or providing substitute resources or environments."  (Guidelines, § 15370.)

Appellants argue the MMP falls squarely within this definition because it reduces or eliminates the impact over time by preservation and maintenance operations during the life of the action.  Appellants note the NOE relies on the MMP to "prevent" nonpoint-source pollution into the creek and indirect impacts to aquatic species and finds no significant impacts with implementation of the MMP.

However, the MMP is not a new measure proposed for or necessitated by the rodeo project.  Rather, it is a preexisting measure previously implemented to address a preexisting concern, which was formalized in writing before the rodeo project was

12

proposed. Thus, the MMP is actually part of the ongoing "normal operations" of the Fairground. Use of this measure does not disqualify the rodeo project from Class 23 exemption.

Appellants rely on *SPAWN* to make their point, but their reliance is misplaced. In *SPAWN*, a county determined that the proposed construction of a home was categorically exempt from CEQA under an exemption for single-family homes, even though the home was adjacent to a protected anadromous fish stream and within a stream conservation area which the county conceded was of "critical concern." (*SPAWN*, *supra*, 125 Cal.App.4th at p. 1106.) In arriving at the conclusion that there was no reasonable possibility of significant environmental impacts that would preclude the exemption, the county relied on *proposed* mitigation measures attached to the grant of the categorical exemption. The landowner's engineering consultant acknowledged runoff from new rooftops and driveways could erode stream banks. Consequently, the consultant proposed dozens of drainage features for erosion and sediment control. (*Id*. at pp. 1106-1107.)

The *SPAWN* court affirmed the trial court's order to set aside the county's approval of the project, stating, "Reliance upon mitigation measures (whether included in the application or later adopted) involves an evaluative process of assessing those mitigation measures and weighing them against potential environmental impacts, and that process must be conducted under established CEQA standards and procedures for EIRs [environmental impact reports] or negative declarations." (*SPAWN*, *supra*, 125 Cal.App.4th at p. 1108.) The court further stated, "there are sound reasons for precluding reliance upon mitigation measures at the preliminary stage of determining eligibility for a categorical exemption. Regulatory guidelines dealing with the environmental review process under CEQA 'contain elaborate standards—as well as significant procedural requirements—for determining whether *proposed* mitigation will adequately protect the environment and hence make an EIR unnecessary; in sharp

13

contrast, the Guidelines governing preliminary review do not contain any requirements that expressly deal with the evaluation of mitigation measures.' [Citation.] An agency should not be permitted to evade standards governing the preparation of a mitigated negative declaration 'by evaluating *proposed* mitigation measures in connection with the significant effect exception to a categorical exemption.' [Citation.]" (*Id.* at p. 1108, italics added.)

Here, unlike *SPAWN,* the NOE did not refer to or rely upon any "proposed" mitigation measures. Rather, as we have noted, the MMP predated this rodeo project and formalized practices that had been implemented for decades. Nothing in the NOE suggests the MMP was created for this project. Quite the contrary, the NOE reads: "Horse and livestock manure is strictly managed in accordance with the District's 'Manure Management Plan.' Manure is collected, contained in enclosed bunkers and hauled offsite, and animal washdown areas flow to the existing sanitary sewer. These required operations and management of the animals will prevent non-point source pollution into the creek and indirect impacts to aquatic species that may be present."

*Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329 (*Wollmer*) is illustrative. In *Wollmer,* an individual challenged the city's approval of a mixed-use building the City found exempt under the exemption for in-fill development. (*Id.* at pp. 1336-1337.) The City had preexisting traffic issues at the intersection where the proposed building was to be constructed. Wollmer contended that the City evaded CEQA by "cutting a deal" with the developers whereby the developers would dedicate land for a left-turn lane on a street at the intersection where the developers planned to construct the building, thereby reducing traffic impacts to less than significant, a necessary condition for the categorical exemption. (*Id.* at p. 1352.) The *Wollmer* court rejected the argument, agreeing with the trial court that the city did not mitigate the project into qualifying for a categorical exemption. Rather, the city properly exercised discretion to find the project would not cause a significant traffic impact. (*Ibid*.) The dedication of the right-of-way,

14

enabling the city to improve the intersection, "was not a CEQA mitigation measure for project impacts, but a component of the project that assisted the City with an existing traffic issue." (*Ibid*.) The appellate court said it was true "that by the time of the final traffic study, the Developers had made the dedication offer and that reality was included in the traffic analysis. Our response is, so what? The point is, the offer of dedication did become part of the project design, improving an existing traffic concern. This is no secret. . . . [¶] Wollmer offers no authority for the proposition that a positive effort between developers and a municipality to improve the project for the benefit of the community and address existing traffic concerns somehow becomes an evasion of CEQA." (*Id*. at p. 1353.) The *Wollmer* court reasoned, "Unlike the situation in [*SPAWN*], the traffic situation improved by the Developers' dedication *preexisted* the proposed project. The dedication became *part of* the project design—it was never a *proposed* mitigation measure." (*Ibid*., first italics added.)

Similarly, here the problem of manure management at the Fairground and the Fairground's MMP preexisted the rodeo project. The MMP was not proposed as a mitigation measure for the rodeo project. It was part of the "normal operations" of the Fairground, and we see no reason why the implementation of a public gathering facility's preexisting program that is part of the facility's normal operations and designed to address ongoing issues should preclude Class 23 exemption.

Appellants claim *Wollmer* is distinguishable because it dealt with an existing concern independent of the project, whereas here the concern stemmed from the rodeo project itself. We disagree. Given the nature and number of the other equestrian and livestock events, manure management was an ongoing concern at the Fairground. Here, even more so than the measure in *Wollmer*, the MMP was never a proposed mitigation measure for this rodeo project. Indeed, unlike *Wollmer*, evidence in the record supports a finding that the so-called mitigation measure here was in place for decades. While the aborted first rodeo project may have provided an impetus for the District to formalize the

MMP by putting it in writing, it was not the initial rodeo plan or this rodeo project that created a need for the MMP or the procedures reflected in the plan that had long since been implemented.

In their reply brief, appellants make a factual argument, contending for the first time that the MMP was not an ongoing policy for decades. Appellants point to documents from a May 24, 2011, District meeting showing complaints from a horse show operator, Bud Thoman, who complained of problems his horse show encountered with "changes recently made to the facility and operations of the arena including . . . the change in manure removal strategy" which assertedly created a hazard during horse show operations. He said, "The proposed handling of manure I was advised that manure was to be, be taken from in front of each stall on the day, uh, as opposed to using a local pile method that we had in the past." Appellants also refer to the minutes of that same meeting showing comments by Horse Show Committee member Blanca Boyd that "the manure trailers that Mr. Thoman objected to previously as interfering with the flow of traffic during his horse shows are indeed part of the manure management practices on the Fairground[] and are here to stay. She further noted that due to these practices, as of this last year, there is currently no manure stored on the Fairground[] whatsoever and [it] is hauled away by trailer on an as needed basis. . . ." Ms. Boyd said no one liked manure management interfering with the events, but it was "part of the . . . future picture. We no longer tolerate manure all over the ground. It's picked up after every single horse show, it is put up, it is put into the trailers, the trailers are hauled away [and] a new trailer is brought in its place. This is an ongoing thing. So this manure on the ground, uh, going into the creek, maybe it did, many years ago, it didn't do it this year."

These new points do not change our analysis.[7]  At most, they suggest contrary evidence indicating the change to daily hauling of manure, as opposed to hauling after the events, may have been a recent change that applies to all events, which of course means the change applies to and is part of the ongoing preexisting operations of the Fairground.  Thus, even assuming daily hauling was a recent change as of Mr. Thoman's May 2011 comment, the change was already in place when the District issued the NOE in May 2011 for this October 2011 rodeo.  The critical point is that the MMP preexisted the NOE for this rodeo project and was directed toward a preexisting concern.  It was not proposed for or created by this rodeo project.

We conclude the MMP was not a mitigation measure precluding the categorical exemption.  We next consider the categorical exemption and the applicability of the unusual circumstances exception that would disqualify the rodeo project from exemption.

### III.  Class 23 Categorical Exemption - Normal Operations of Public Gathering Facilities

Appellants contend the unusual circumstance exception, which applies when there are "significant effects on the environment" "due to unusual circumstances" (Guidelines, § 15300.2, subd. (c); see fn. 4, *ante*), precludes application of the Class 23 exemption for normal operations of public gathering facilities to the rodeo project.  We disagree.

However, before determining the applicability of the unusual circumstances exception to the exemption, we must determine the scope of the exemption and whether the rodeo project qualifies.  (*Cal. Farm Bureau*, *supra*, 143 Cal.App.4th at p. 185.)  As

---

[7] Appellants' opening brief did not contain this factual argument.  Appellants simply argued, "just because the trial court found that manure management measures have ostensibly been available and used at other events at the Fairground[] for many years does not detract from the Manure Plan's qualification as a mitigation measure . . . ."  While we may disregard factual points raised for the first time in the reply brief (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8), we exercise our discretion to address these new points on the merits.

17

will be seen, this determination informs our review of whether the proposed project presents unusual circumstances.

We read the Class 23 categorical exemption for "normal operations" of public gathering facilities as consisting of three elements. The exemption applies to projects that: (1) are normal operations of existing facilities for public gatherings for which the facilities were designed, (2) where there is a past history of the facility being used for the same or similar purpose within at least the past three years, and (3) there is a reasonable expectation that the future occurrence of the activity would not represent a change in the operation of the facility. (Guidelines, § 15323, fn. 3, *ante*.)

The "normal operations" of the Fairground are the public events and activities it puts on and the internal operations it employs to facilitate the production of those events. The rodeo project is indistinguishable from other livestock and equestrian events held at the Fairground for many, many years. It involves the presence of no more cattle and/or horses in Fairground facilities than have been present for prior events. These facilities are designed to house those animals, and no changes to the facility or facility operations are necessary for the rodeo project. We conclude that the Class 23 categorical exemption applies to the rodeo project.

## IV. The Unusual Circumstances Exception[8]

### A. The Analytical Framework and Standards of Review

In *Voices for Rural Living v. El Dorado Irrigation Dist.* (2012) 209 Cal.App.4th 1096, 1107 (*Voices*), this court said two questions are at issue in reviewing an agency's

---

[8] This exception has in the past sometimes been called either the "significant effects" exception or the "unusual circumstances" exception. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1381 (*San Lorenzo*).) More recently, our high court has referred to the exception as the "unusual circumstances exception." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1096, fn. 2.) Accordingly, so do we.

determination that a project did not trigger the exception for unusual circumstances that have a significant effect on the environment. " 'First, we inquire whether the [p]roject presents unusual circumstances.[9] Second, we inquire whether there is a reasonable possibility of a significant effect on the environment due to the unusual circumstances. [Citation.]' " (*Voices*, *supra*, 209 Cal.App.4th at pp. 1107-1108, citing *Banker's Hill*, *Hillcrest*, *Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 278 (*Banker's Hill*).) " 'A negative answer to either question means the exception does not apply.' " (*Bankers Hill*, at p. 278.)

In *Berkeley Hillside*, *supra*, 60 Cal.4th 1086, our high court added additional clarification to the unusual circumstance exception analysis. The court identified two alternative ways to prove the exception. (*Id*. at p. 1105.)

In the first alternative, as this court said in *Voices*, a challenger must prove both unusual circumstances and a significant environmental effect that is due to those circumstances. In this method of proof, the unusual circumstances relate to some feature of the project that distinguishes the project from other features in the exempt class. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) Once an unusual circumstance is proved under this method, then the "party need only show a *reasonable possibility* of a significant effect due to that unusual circumstance." (*Ibid*., italics added.)

_____

**9** At oral argument, appellant asserted that the mere fact there is a reasonable possibility of an environmental effect is an unusual circumstance and implied that nothing more need be shown. Since then, our high court rejected the same argument. In *Berkeley Hillside*, the court observed that the plain language of Guideline section 15300.2, subdivision (c), supports the view that "it is not alone enough that there is a reasonable possibility the project will have a significant environmental effect; instead, in the words of the Guideline, there must be 'a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*.' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1097.) Given this language, "a potentially significant effect must be 'due to unusual circumstances' for the exception to apply." (*Id*. at p. 1104.)

The court in *Berkeley Hillside* made clear that "section 21168.5's[10] abuse of discretion standard appl[ies] on review of an agency's decision with respect to the unusual circumstances exception. The determination as to whether there are 'unusual circumstances' [citation] is reviewed under section 21168.5's substantial evidence prong. However, an agency's finding as to whether unusual circumstances give rise to 'a reasonable possibility that the activity will have a significant effect on the environment' [citation] is reviewed to determine whether the agency, in applying the fair argument standard, 'proceeded in [the] manner required by law.' [Citations.]" (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.)

As for the first prong of the exception -- whether the project presents circumstances that are unusual for projects in an exempt class -- this question is essentially a factual inquiry for which the lead agency serves as " 'the finder of fact.' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.) Thus, reviewing courts apply the traditional substantial evidence standard incorporated in section 21168.5 to this prong. (*Berkeley Hillside*, at p. 1114.) Under that relatively deferential standard of review, our role in considering the evidence differs from the agency's. (*Ibid.*) " ' "Agencies must weigh the evidence and determine 'which way the scales tip,' while courts conducting [traditional] substantial evidence . . . review generally do not." ' [Citation.] Instead, reviewing courts, after resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding, must

---

**10** Section 21168.5 applies to actions in which an evidentiary hearing is not required. In such actions "to attack, review, set aside, void or annul a determination, finding, or decision of public agency" on the grounds of noncompliance with CEQA, a court's inquiry "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.)

affirm that finding if there is any substantial evidence, contradicted or uncontradicted, to support it. [Citations.]" (*Ibid*.)

As for the second prong of the exception -- whether there is "reasonable possibility" that an unusual circumstance will produce "a significant effect on the environment" -- our high court has said "a different approach is appropriate, both by the agency making the determination and by reviewing courts." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115.) "[W]hen there are 'unusual circumstances,' it is appropriate for agencies to apply the *fair argument* standard in determining whether 'there is a reasonable possibility of a significant effect on the environment due to unusual circumstances.' " (*Ibid*., italics added.) Under the fair argument test, " 'an agency is merely supposed to look to see if the record shows substantial evidence of *a fair argument* that there *may be* a significant effect. [Citations.] In other words, the agency is not to weigh the evidence to come to its own conclusion about whether there will be a significant effect. It is merely supposed to inquire, *as a matter of law*, whether the record reveals a fair argument. . . . " '[I]t *does not resolve conflicts in the evidence* but determines only whether substantial evidence exists in the record to support the prescribed fair argument.' " [Citation.]' " (*Id.* at pp. 1103-1104, second italics added, quoting *Banker's Hill*, *supra*, 139 Cal.App.4th at p. 263.) Thus, a lead agency must find there is a fair argument even when presented with other substantial evidence that the project will not have a significant environmental effect. (*Berkeley Hillside*, at p. 1111; see also Guidelines, § 15064, subd. (f)(1).) Accordingly, where there is a fair argument, "a reviewing court may not uphold an agency's decision 'merely because substantial evidence was presented that the project would not have [a significant environmental] impact. The [reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made.' " (*Berkeley Hillside*, at p. 1112.) Thus, the "agency must evaluate potential environmental effects under the fair argument standard, and judicial review is limited to

21

determining whether the agency applied the standard 'in [the] manner required by law.' " (*Id*. at p. 1116.)

In the second alternative for proving the unusual circumstance exception, "a party may establish an unusual circumstance with evidence that the project *will have* a significant environmental effect." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105, italics added.) "When it is shown 'that a project otherwise covered by a categorical exemption *will have* a significant environmental effect, it necessarily follows that the project presents unusual circumstances.' [Citation.]" (*Id*. at pp. 1105-1106, italics omitted and added.) But a challenger must establish more than just a fair argument that the project will have a significant environmental effect. (*Id*. at p. 1105.) A party challenging the exemption, must show that the project *will have* a significant environmental impact. (*Ibid*.) Again, as our high court has noted, we review the determination of the unusual circumstances prong of the exception under the deferential substantial evidence test. (*Id*. at p. 1114.)

As for the second prong under this second alternative, no other proof is necessary. Evidence that a project *will have* a significant environmental effect, "if convincing, necessarily also establishes 'a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.' [Citation.]" (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) In other words, a showing by substantial evidence that a project *will have* a significant effect on the environment satisfies both prongs of the unusual circumstance exception under the second method of establishing the exception.

We now look to the proof in this case related to the unusual circumstance prong.

### B. Proving Unusual Circumstances

As we have noted, under *Berkeley Hillside*, there are two ways to prove the unusual circumstances prong of the exception. We begin with the first alternative.

## 1. Features of the Project as Unusual Circumstances

As this court observed in *Voices*, the Guidelines do not define the term "unusual circumstances." (*Voices*, *supra*, 209 Cal.App.4th at p. 1109.) However, as our high court noted in *Berkeley Hillside*, a party can show an unusual circumstance by showing that the project has some feature that distinguishes it from others in the exempt class, such as its size or location. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105; accord, *Voices*, at p. 1109 [" 'whether a circumstance is "*unusual*" is judged relative to the *typical* circumstances related to an otherwise typically exempt project' "]; *San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1381 [an unusual circumstance refers to some feature of the project that distinguishes it from others in the exempt class]; *Azusa*, *supra*, 52 Cal.App.4th at p. 1207 [courts view circumstances as unusual within the meaning of the exemption when "the circumstances of a particular *project* [] differ from the general circumstances of the *projects* covered by a particular categorical exemption"], italics added.) Thus, as we will discuss in more detail, when determining whether the circumstances of the *project* differ from the general circumstances of the *projects* covered by the Class 23 categorical exemption for the normal operations of a public gathering facility, it is appropriate to look to the facility's other projects, i.e., events or operations that comprise the normal operations of that facility and compare those circumstances against those presented by the proposed project.

Appellants contend that we must not compare the rodeo project to other Fairground events in determining whether it presents unusual circumstances, but rather we must compare the rodeo project to activities held at other facilities that would be exempt under the Class 23 exemption. According to appellants, we must compare the circumstances presented by a proposed project to all public gathering facilities in general, including "racetracks, stadiums, convention centers, auditoriums, amphitheaters, planetariums, swimming pools, and amusement parks" (see Guidelines, § 15323, fn. 3, *ante*) and apparently all other public gathering facilities not expressly listed in the

23

Class 23 exemption.  Appellants also, apparently as an alternative argument, narrow the comparison, contending that we must compare the Fairground facility to other "normal" fairground facilities.  Focusing on a comparison to the universe of public gathering facilities or the universe of "normal" fairgrounds, appellants then look to circumstances related to the Fairground facility that are different from other public gathering facilities and/or other fairgrounds.  They contend the impaired status of the Salsipuedes Creek is a circumstance that is different from "normal facilities" for which a Class 23 exemption is provided and is thus an unusual circumstance within the meaning of the unusual circumstance exception.

We reject appellants' argument for two reasons specific to the Class 23 exemption for the normal operations of public gathering facilities.  First, examining public gathering facilities generally covered by the exemption in most cases will not produce an apples-to-apples comparison from which courts could determine whether a circumstance related to normal operations is usual or unusual.  Racetracks, stadiums, convention centers, auditoriums, amphitheaters, planetariums, swimming pools, and amusement parks are so different in general that any comparison of circumstances relating to the operations of such facilities will often yield unhelpful results.  This is so simply because a project that would be unusual for one venue, may not be unusual for another type of public gathering facility given the nature of the operations at such facilities.  For example, it would be extremely unusual to have horses or cattle and manure anywhere near a public swimming pool; thus, a comparison of the operations of public swimming pools to fairground facilities for usual and unusual circumstances would be unfair.  Second, even if courts were required to look to the universe of all Class 23 exempt public gathering facilities or the smaller universe of all "normal" fairgrounds[11] for comparison of the usual

_____

[11]  Appellants do not describe a "normal" fairground, and they have not established that there is such a thing.  In our geographically diverse state, fairgrounds are located in cities,

24

circumstances related to their normal operations, appellants have offered *no proof whatsoever* of the circumstances related to other public gathering facilities or "normal" fairgrounds against which the comparison of the unusual and usual should be made. And appellants have the burden of producing evidence supporting the exception. (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1104-1105; *Wollmer*, *supra*, 193 Cal.App.4th at p. 1350; *Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1186 (*Hollywoodland*); *Cal. Farm Bureau*, *supra*, 143 Cal.App.4th at p. 186.)

Appellants rely primarily on *Azusa* for the proposition that we must compare the Fairground to all other public gathering facilities in general and that proximity to a water source could be an unusual circumstance. *Azusa* did not involve a Class 23 exemption for "normal operations" of public gathering facilities. That case involved a Class 1 exemption for the "operation . . . or minor alteration of existing . . . facilities" (Guidelines, § 15301),[12] referred to as the "existing facilities" exception (*Azusa*, *supra*,

_____

suburbs, and rural areas. They vary in size, nature and scope of events, the number of spectators and visitors, the number and type of livestock on site and the time of the year when livestock events are held, which may or may not be in a rainy season. They also differ in proximity to water sources -- some are likely nearer to water sources than others. Moreover, there are likely differences in drainage systems and stormwater runoff which may involve runoff into storm drains, groundwater, and/or nearby bodies of water. Assuming such a comparison was appropriate in determining whether the rodeo event at the Fairground and the potential stormwater runoff were public gathering facility operations that presented an unusual circumstance relative to other fairgrounds, we need not attempt to make this comparison here because, as we discuss *post*, appellants have provided no evidence for us to compare.

[12] "Class 1 consists of the *operation*, repair, maintenance, permitting, leasing, licensing, or *minor alteration of existing* public or private structures, *facilities*, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1. The key consideration is whether the project involves negligible or no expansion of an existing use." (Guidelines, § 15301, italics

52 Cal.App.4th at p. 1193). In *Azusa,* unlike here, the "facility" and the project were essentially one and the same.

The project in *Azusa* was the reopening of an 80-acre unlined municipal solid waste landfill located in an empty sand and gravel pit which was situated on top of the Main San Gabriel Groundwater Basin, an underground reservoir that supplied the water needs of approximately one million people. (*Azusa*, *supra*, 52 Cal.App.4th at pp. 1175-1176, 1178.) Previously, the State Board had rescinded the landfill's permit allowing the disposal of municipal solid waste, and the landfill closed. (*Id*. at pp. 1175-1176.) The plan for the reopened landfill was that 3.2 million tons of municipal solid waste would be deposited over a seven-year period. (*Id*. at p. 1176.) The State Board refused to stand in the way. The Regional Water Board declared the project exempt under the Class 1 existing facilities exemption (*id*. at pp. 1176, 1192-1193), notwithstanding that the Basin was polluted, it was on the EPA's superfund list, and the contamination problem had been previously characterized by the Legislature as "urgent" (*id*. at p. 1178). On appeal, the court concluded that the language of the Class 1 categorical exemption for the operation and minor alteration of existing facilities should not be construed to include a large, municipal waste landfill. The court reasoned: the landfill was not a "facility" within the meaning of the guideline for existing facilities[13] (*Azusa*, *supra*, 52 Cal.App.4th

---

added.) A nonexclusive list of examples in the guideline includes: Plumbing and electrical conveyances, public and private utilities, highways, streets, sidewalks, gutters, bicycle and pedestrian trails, water supply reservoirs, fish screens fish ladders, wildlife habitat areas, artificial wildlife waterway devices, artificial wildlife waterway devices, stream channels to protect fish and wildlife resources, multiple and single-family residences. (Guidelines, § 15301.)

[13] The court noted that the concept of "facility" is vague. The court then cited a dictionary definition, noted that a landfill is excavated and observed that a landfill does not necessarily fit the dictionary definition of "facility," and further noted that landfills are not included in the list of examples set forth in Guidelines section 15301. (*Azusa*, *supra*, 52 Cal.App.4th at pp. 1193-1194.)

at pp. 1193-1194); the layering of 3.2 million tons of solid waste over time was not a "minor alteration" within the meaning of the exemption[14] (*id*. at p. 1194); there had been a legislative determination that some of the state's existing landfills posed a threat to groundwater, air quality and public health (*id*. at p. 1195); and the rationale for the existing facility exemption (that the environmental effects of the facility operation had already been considered) does not apply to landfills that, like the one at issue, had not been reclassified pursuant to legislative directive (*id*. at pp. 1195-1996).  Thus, the *Azusa* court essentially held that large, municipal waste landfills cannot be exempt under Class 1.

The *Azusa* court then went on to criticize the regional water board's implied finding that the unusual circumstances exception[15] did not preclude the categorical exemption.  (*Azusa*, *supra*, 52 Cal.App.4th at pp. 1197-1209.)  In looking at the first question in determining the applicability of the exception -- the existence of an unusual circumstance -- the court noted numerous circumstances that were unusual in comparison with "existing facilities in general" (*id*. at p. 1207), including the circumstance that large scale landfilling with municipal waste was not entitled to any exemption; waste disposal landfills differ from other types of existing facilities in that the Legislature had determined that such landfills posed a threat to the environment, and required that they be reevaluated and reclassified; the landfill did not have the safeguards needed to protect the environment from the types of pollutants that landfills are likely to produce; and there has been an increasing awareness of the environmental hazards posed by

---

[14]  The court reasoned that, "neither 'existing facilities' nor the 'operation' of such facilities should be construed to include landfills where the proposed dumping will exceed the 'minor alteration' that the Guidelines permit."  (*Azusa*, *supra*, 52 Cal.App.4th at p. 1194.)

[15]  The court referred to the exception as the "significant effect" exception.  (*Azusa*, *supra*, 52 Cal.App.4th at p. 1197.)

landfills, and the hazards posed by this landfill in particular (*id*. at pp. 1207-1208). In addition to these unusual circumstances, the court noted that the landfill differed from "existing waste disposal landfills in general" in that it overlay a major drinking water aquifer in highly permeable sands and gravel that provide a direct pathway for landfill pollutants to move to ground water. (*Id*. at p. 1208.) Thus, given the nature of the facility and the claimed exemption (operation of and minor alteration of existing facilities), the focus of comparison was between the Azusa landfill facility to other existing Class 1 facilities "in general" and other landfill facilities, not specific activities of the facility that could be considered individual projects for CEQA purposes.[16] Indeed, the project and facility in *Azusa* were indistinguishable because landfills engage in only one activity -- the deposit of municipal waste. Here, the Fairground facility involves operations other than those involving horses and cattle and the exemption relates to the normal operations of the facility. Consequently, we focus not on the facility itself, but on the specific operations of the facility involving horses and cattle.

Appellants also rely on *Hollywoodland* for support of their contention that we must look to other facilities in general covered by the exemption when determining whether the proposed project has unusual circumstances. In *Hollywoodland*, the petitioners sought to compel the City of Los Angeles to rescind approval of a wooden fence a homeowner had constructed atop one of the historic granite walls in the Hollywoodland community. (*Hollywoodland*, *supra*, 161 Cal.App.4th at p. 1172.) On appeal, the court rejected the city's position that the fence was categorically exempt

---

[16] Guidelines section 15378, subdivision (a), broadly defines a "project" to mean "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ."

28

under Class 5 because it represented a " 'minor alteration in land use limitations.' "[17] (*Id*. at p. 1180.) The court further held that even if the fence were exempt, the unusual circumstances exception precluded the exemption because there was a strong possibility of an adverse impact upon a historical monument. (*Id.* at p. 1185.) In making the latter determination, the court reasoned that the city failed to consider whether the circumstances of the fence differed from the general circumstances of projects covered by the exemption. The fence was different from the typical " 'minor land use alteration' " contemplated by the exemption because the alteration was to a historical resource. The stone walls were old and unique, and any change to them could significantly alter their physical composition. (*Id.* at p. 1187.) Thus, the court impliedly determined the circumstances were unusual compared to other minor land use alterations.

The Class 23 exemption for the normal operations of public gathering facilities is different from the Class 5 exemption for minor land use alterations. Because the gravamen of the Class 5 exemption is an alteration to a land use, the focus of comparison is appropriately on other minor land use alterations in general. The Class 23 exemption, on the other hand, involves the various activities that are "normal operations" of a public gathering facility, and the focus of comparison should, therefore, be on those activities that make up the facility's normal operations. *Hollywoodland* does not support appellants' position.

Appellants also find support for their argument in *Wollmer*. We do not. In *Wollmer*, the city determined that the proposed mixed-use building project was exempt

---

[17] The Class 5 exemption consists in pertinent part of "minor alterations in land use limitations in areas with an average slope of less than 20%, which do not result in any changes in land use or density, including but not limited to: [¶] (a) Minor lot line adjustments, side yard, and set back variances not resulting in the creation of any new parcel . . . ." (Guidelines, § 15305.)

29

under the Class 32 exemption for in-fill development.[18]  The appellant argued that the location of the project at the intersection of two major thoroughfares, and his view of the city's traffic modeling, qualified as unusual circumstances.  (*Wollmer*, *supra*, 193 Cal.App.4th at pp. 1351-1352.)  Appellants here focus on the *Wollmer* court's holding regarding the location argument, quoting the court's statement that "locating an in-fill project at the intersection of two major city streets that also happen to serve as state highway routes is well within the range of characteristics one would except for class 32 projects and precisely what the law encourages." (*Id*. at p. 1351.)  We fail to see how this advances appellants' position here.  The quote relates solely to the *Wollmer* court's observation that the location was not an unusual circumstance because the location fit the criteria of the in-fill exemption.  (*Ibid*.)

Appellants rely on *Myers v. Board of Supervisors* (1976) 58 Cal.App.3d 413 (*Myers*) for the proposition that a nearby water source is an unusual circumstance.  Like *Azusa*, *Myers* did not involve the Class 23 exemption for normal operations.  *Myers* involved a county's interpretation of the Class 4 exemption for "minor alterations *in the condition* of land."[19]  (*Myers*, at p. 423, italics added.)  Appellants sought a writ of

---

[18]  "Class 32 consists of projects characterized as in-fill development meeting the conditions described in this section.  [¶]  (a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.  [¶]  (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.  [¶]  (c) The project site has no value, as habitat for endangered, rare or threatened species.  [¶]  (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.  [¶]  (e) The site can be adequately served by all required utilities and public services."  (Guidelines, § 15332.)

[19]  "Class 4 consists of minor public or private alterations *in the condition of land*, water, and/or vegetation which do not involve removal of healthy, mature, scenic trees except for forestry and agricultural purposes."  (Guidelines, § 15304, italics added.)  Various examples are listed in the exemption, including:  Grading on a slope of less than 10 percent, with certain specified exceptions (Guidelines, § 15304, subd. (a)); New or

30

mandate ordering a county board of supervisors to rescind a resolution granting a request for minor land division to subdivide property into three new parcels for use as home sites. (*Id*. at pp. 417-419.)  The board had interpreted the Class 4 exemption as including a "minor land division."  (*Id*. at pp. 418, 422.)  The appellate court held the county had misconstrued the Class 4 exemption, and a land division was not a "minor alteration in the *condition* of land," but rather it was an alteration in the "use" of land.  (*Id*. at pp. 423-425.)  The *Myers* court then went on to determine whether the land division was exempt under Guidelines former section 15060, which at the time provided in pertinent part, "Where it can be *seen with certainty* that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not covered by the requirements set forth in CEQA, and these Guidelines concerning the evaluation of projects and the preparation and review of environmental documents do not apply."[20] (*Myers*, at p. 425, italics added; see *id.* at pp. 425-427.)  It was in the context of determining whether it was *certain* there was no possibility of a significant environmental effect that the court noted the appellant's claim that there was a danger of sewage from

replacement gardening or landscaping (Guidelines, § 15304, subd. (b)); Filling of earth into previously excavated land with material compatible to natural features of the site; (Guidelines, § 15304, subd. (c)); Minor alterations in land, water, and vegetation on designated wildlife management areas or fish production facilities which result in improvement of the habitat or greater fish production (Guidelines, § 15304, subd. (d)); Minor temporary use of land having negligible or no permanent effects on the environment, including carnivals, sales of Christmas trees, etc. (Guidelines, § 15304, subd. (e)); Minor trenching and backfilling where the surface is restored (Guidelines, § 15304, subd. (f)); Maintenance dredging where the spoil is deposited in an authorized spoil area (Guidelines, § 15304, subd. (g)); The creation of bicycle lanes on existing rights-of-way (Guidelines, § 15304, subd. (h)); and Certain fuel management activities to reduce the volume of flammable vegetation (Guidelines, § 15304, subd. (i)).

[20] This exemption can now be found in Guidelines section 15061, subdivision (b)(3), which states, "Where it can be seen *with certainty* that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA."  (Italics added.)

31

the necessary septic lines seeping into a nearby stream and polluting it. (*Id*. at pp. 426-427.) The court reasoned that even if this and other claims made by the appellant were exaggerated or untrue, they were "sufficient to remove the subject project from the class 'Where it can be *seen with certainty* that there is no possibility that the activity in question may have a significant effect on the environment . . . .' " (*Id*. at p. 427, italics added.) *Myers* did not involve application of the "unusual circumstances" exception, so it has no application here.

Appellants also misplace reliance on *Meridian Ocean Systems, Inc. v. State Lands Com.* (1990) 222 Cal.App.3d 153 for the proposition that proximity to a water source is an unusual circumstance. In *Meridian*, three companies engaged in the business of conducting seismic research in the Pacific Ocean sued the State Lands Commission after the Commission ordered preparation of an EIR before acting on applications to renew the companies' permits. (*Id.* at pp. 162-163.) *Meridian* is obviously distinguishable. There, the water source was not merely in close proximity; rather, the project activities took place *in* the water source. Moreover, the *Meridian* court did not actually hold that the water source was the unusual circumstance. The court determined that the unusual circumstance was the fact that new scientific evidence showing a possible significant effect on the environment was not available when a previous exemption was granted. (*Id.* at p. 164.) *Meridian* does not support appellants' contention.

Without analysis, appellants cite *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136 (disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2 (*Western States*)), for the proposition that "[w]here the location of a project is endowed with contamination that relates to the project, then unusual circumstances exist as to both the project and the facility." Appellants overstate the holding of that case. In *McQueen*, the project involved the purchase of two parcels by a regional open space district from the federal government. The parcels, which adjoined the district's open space reserve, formerly had been an Air

Force station and a ground air transmitter site. (*McQueen*, at p. 1140.) The property was polluted. (*Id.* at pp. 1140-1141.) The *McQueen* court first held that the district's description of the project was misleading because it described the project as "acquisition of named surplus federal property for public open space" (*id.* at p. 1144), when the project not only involved acquisition but also maintenance of hazardous waste known to be on the property (*id.* at pp. 1143-1147). After concluding that the project was not exempt under the exemptions asserted by the district (including the Class 25 exemption for transfers of ownership of interests in land in order to preserve open space), the *McQueen* court held that the exemptions were precluded for the additional reason that the unusual circumstance exemption applied. (*Id.* at pp. 1148-1149.) The court reasoned, "the known existence of PCB [polychlorinated biphenyls] and other hazardous wastes on property to be acquired is an *unusual circumstance*" threatening the environment. (*Id.* at p. 1149, italics added.)

*McQueen* is distinguishable from the instant case. *McQueen* did not involve a proposed project related to the operations at an ongoing facility, let alone the normal operations of a public gathering facility. *The project* in *McQueen* was the *purchase* of polluted property and the necessary *maintenance* of the hazardous waste on the property after the purchase. In the context of the exemption for transfer of land to preserve open space, the fact that the land to be transferred was contaminated and required ongoing measures to deal with the hazardous waste on site was unusual compared to other land transfers for open space. *McQueen* does not advance appellants' position here, where the focus is on the operations of the facility.

Appellants suggest the court in *SPAWN* also found an "unusual circumstance" in a project's proximity to a creek. Not so. *SPAWN* did not involve application of the unusual circumstances exception at all. As we discussed *ante*, the court in *SPAWN* held that the project was not exempt because the County relied upon proposed mitigation

33

measures to grant a categorical exemption.  (*SPAWN*, *supra*, 125 Cal.App.4th at pp. 1106-1108.)

There are only two published cases involving the Class 23 exemption for the normal operation of public gathering facilities, both from this court.  Appellants rely upon one, *Lewis v. Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823 (*Lewis*), and ignore the other, *Campbell v. Third Dist. Agricultural Assn.* (1987) 195 Cal.App.3d 115 (*Campbell*), which distinguished *Lewis* on a point that is relevant here.

On first blush, *Lewis* seems supportive of the notion that proximity of a neighborhood to a public gathering facility activity could be an unusual circumstance.  But a closer look at *Lewis* reveals that it was actually the activity in question, made possible by a change in the facility, which presented the unusual circumstance.  The public gathering facility in *Lewis* was a modified racetrack at a county fairground situated less than a mile from a residential neighborhood.  For some 15 years, a flat dirt racetrack had been used for auto races until a banked track was constructed in 1973.  (*Lewis*, *supra*, 165 Cal.App.3d at p. 826.)  The new track allowed for higher powered "modified stock" car races.  (*Ibid*.)  Residents complained about the noise and dust generated from the modified stock car races, and in 1980, the district association undertook a study.  In the meantime, a resident sought mandamus and injunctive relief, complaining that the modified stock car races had been conducted without environmental review and seeking cancellation of the contract between the agricultural district association and the promoter of the races.  (*Id.* at pp. 826-827.)  Thereafter, the district association filed a notice of exemption, relying on the Class 23 exemption for normal operations of public gathering facilities.  (*Id.* at pp. 827-828.)  This court held that the district association abused its discretion by finding the modified stock car racing events categorically exempt under Class 23 because there was a reasonable possibility of a significant effect on the environment due to unusual circumstances.  (Guidelines, § 15300.2.)

It does not appear that the unusual circumstances prong of the exception was a matter of active dispute in *Lewis* as there was substantive analysis only on the significant effect prong. The key unusual circumstance that differentiated the project from other auto racing events that had been held prior to the modification of the track was that the modified stock car racing was noisier and created more dust. (*Lewis*, *supra*, 165 Cal.App.3d at p. 829.) However, while this court stated it was limiting its analysis to the application of the normal operations exemption to the " 'unusual circumstances' in [the] case, *those concerning* neighboring residences," it also said "there is no question of the existence of unusual circumstances -- the *adjacency* of residential areas to the racetrack." (*Id.* at p. 829, italics added; see *id.* at pp. 828-829.) Yet, the adjacency of the residences existed before the track was banked, and it was actually the characteristics of the modified stock car races -- more noise and dust -- that were the unusual circumstances concerning the nearby residences that made the modified stock car race project different from events that had taken place at the fairground prior to the modification of the track.[21] Thus, although the court called the adjacency of the residences an unusual circumstance, without the added noise and dust, the project presented no circumstances that were different from the preexisting normal operations of the fairground, including previous auto races.

Here, the issue is not noise and dust permeating nearby neighborhoods, but rather the horse and cattle manure and the potential impact on the nearby creek.[22] Appellants

---

[21] In discussing the significant effect prong of the exception, the *Lewis* court noted, "The evidence clearly shows a major change in the scope and degree of racing at the fairgrounds occurred after 1970, specifically in 1973, when the construction of a banked racetrack permitted auto racing at higher speeds and with *greater noise and dust*." (*Lewis*, *supra*, 165 Cal.App.3d at p. 829, italics added.)

[22] Appellants here expressly state in their reply brief that they "have not advanced *any* claims on appeal that inconsistency with existing residential uses creates unusual

show no change in the facility, nor a change in the use of the facility relative to the temporary housing of cattle and horses, nor any other change in operations, let alone changes that could constitute unusual circumstances. Thus, *Lewis*, where there was a significant change in the operation which resulted in unusual circumstances compared to previous operations, is of no help to appellants.

This court considered *Lewis* in *Campbell*, the only other published case involving the Class 23 exemption. *Campbell* also involved auto racing at a county fairground adjacent to a residential area. The racetrack in *Campbell* was constructed before the enactment of CEQA, but unlike the racetrack in *Lewis*, it was not modified or operated differently than it had been since its construction in 1962. This court distinguished *Lewis* on the ground that there was no change in the normal operations. Thus, there was no adverse change in the environment, and the continued operation of the racetrack in 1986 was categorically exempt from CEQA. (*Campbell*, *supra*, 195 Cal.App.3d at pp. 118-119.) Likewise, here, the rodeo project does not represent a change in the operation of the Fairground.

Here, the rodeo project had no unusual circumstances to distinguish it from others in the exempt class, e.g., other "normal operations" of the Fairground. The normal operations of the Fairground included about two dozen equestrian and/or livestock events each year for at least the last three years before the rodeo. The proposed rodeo did not involve more horses or livestock than were used for the other events and no changes to the facility or the operations were necessary.

Courts may also look to conditions in the immediate vicinity of a proposed project to determine whether a circumstance is unusual. (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1118-1119.) This includes whether the project is consistent with the surrounding

circumstances for the Rodeo Project. [Fn. omitted.] [Appellants] have maintained that unusual circumstances in this matter result from the proximity of the Project to the degraded creek."

zoning and land uses.  In *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810 (*City of Pasadena*) (disapproved on other grounds in *Western States*, *supra*, 9 Cal.4th at p. 570, fn. 2), a city tried to void a lease between the state and a private landowner for the state to operate a parole office in a building located in the city.  (*City of Pasadena*, at p. 814.)  The state invoked a categorical exemption for " 'the leasing of existing office space which has been determined not to have a significant effect upon the environment.' " (*Id*. at p. 820.)  The city argued the exemption was rendered inapplicable by the exception for unusual circumstances, because the building was located next door to the library, a historic building of cultural significance, and residential development was in progress nearby.  (*Id*. at p. 826.)  The appellate court held the lease of the building for use as a parole office "does not constitute an 'unusual circumstance' within the meaning of CEQA in light of the presence of . . . other custodial and criminal justice facilities in the immediate area." (*Id*. at pp. 826-827.)

In *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, an individual sought a writ of mandate to set aside permits issued for the continued operation of a medical waste treatment facility.  The agency had determined that the facility was exempt under the Class 1 exemption for existing facilities.  (*Id.* at pp. 1309, 1312.)  In rejecting the appellant's claim that the proximity of residences presented an unusual circumstance, the *Bloom* court noted that the area was zoned for heavy industry.  The court further noted that the facility's operations were comparable to those of surrounding businesses, and citing *City of Pasadena*, held that the presence of comparable facilities in the immediate area adequately supported an implied finding that there were no " 'unusual circumstances' " precluding a categorical exemption.  (*Bloom*, at pp. 1315-1316.)

Here, the rodeo was consistent with the surrounding zoning, which was commercial agricultural, permitting the commercial raising of animals, including grazing and livestock production, and residential agricultural, permitting animal-keeping and

37

farming. Compared to the activities in the surrounding area, the rodeo presented no unusual circumstances.

We may also look to the scope and size of the project as a potential unusual circumstance. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) *Voices* is an example. There, this court held that the unusual circumstances exception applied to an irrigation district's agreement to provide water to a tribal casino and hotel project. (*Voices*, *supra*, 209 Cal.App.4th at pp. 1108-1114.) The project involved relocating the existing three-inch water meter and installing a short section of pipeline linking the meter to an existing water main, both of which would occur on tribal land. (*Id.* at p. 1103.) The district determined the project was exempt under the Class 3 categorical exemption for new construction or conversion of small structures.[23] (*Id.* at p. 1104.) This court concluded, "the MOU [memorandum of understanding] project presents circumstances that are unusual for this categorical exemption. The proposed project's scope, providing 216 additional EDU's [equivalent dwelling units] of water to a casino and hotel project so large it brings with it its own freeway interchange instead of providing one or four EDU's of water as contemplated by the class 3 categorical exemption is an unusual circumstance under that exemption. The sheer amount of water to be conveyed under the MOU obviously is a fact that distinguishes the project from the types of projects contemplated by the class 3 categorical exemption." (*Id.* at p. 1109.)

Here, perhaps appellants evade comparison of the rodeo project to other Fairground equestrian and livestock events because they have no answer for the fact that

---

[23] Among other things, the Class 3 exemption applies to construction of motels, restaurants or similar structures not exceeding 2,500 square feet in floor area (Guidelines, § 15303, subd. (c)) and the "[w]ater main, sewage, electrical, gas, and other utility extensions, including street improvements, of reasonable length to serve such construction" (Guidelines, § 15303, subd. (d)). In *Voices*, the trial court determined there was sufficient evidence to establish the project was subject to the Class 3 categorical exemption. (*Voices*, *supra*, 209 Cal.App.4th at p. 1104.)

the similarity is clear. Unlike in *Voices*, where the nature and scope of the project were unusual, the project at issue here is no different in nature and scope from previous Fairground events. And appellants have not challenged the other livestock and equestrian events held at the Fairground now or in the past. Indeed, they insist they are *not* challenging the other events at the Fairground. Yet, were we to employ appellants' analysis, other equestrian and livestock events that historically have been within the normal operations of the Fairground would not be exempt.

Assuming we are required to compare the Fairground to other fairgrounds and further assuming the creek could be considered an unusual circumstance compared to other fairgrounds, appellants' asserted comparison to other facilities is not supported by evidence in the record. Appellants argue that, "[a]lthough most fairgrounds include livestock and animal events, the *normal fairground* does not have documented discharges of stormwater [*sic*] from corral areas directly to a creek" (italics added), but appellants cite no evidence to support this factual contention. Without supporting evidence, we must regard their assertion as speculative. Indeed, we could just as easily speculate that there are other county fairgrounds that have similar issues related to stormwater runoff into nearby water sources or runoff into storm drains that flow into water sources, so the circumstances at the Fairground here are not necessarily unusual. As we have noted, once an agency meets its burden of establishing that a project is categorically exempt, the burden shifts to the party challenging the exemption to produce substantial evidence establishing the exception (*Hollywoodland*, *supra*, 161 Cal.App.4th at p. 1186; *Cal. Farm Bureau*, *supra*, 143 Cal.App.4th at pp. 185-186), including establishing the existence of "unusual circumstances" (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1104-1105; *Wollmer*, *supra*, 193 Cal.App.4th at pp. 1350-1351). Appellants cannot satisfy this burden by speculation. They must provide evidence.

Appellants have not produced substantial evidence supporting a finding of unusual circumstances based on features related to the rodeo project. To the contrary, we

39

conclude that the agency's determination of the absence of unusual circumstances in this regard is supported by substantial evidence. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.)[24]

### 2. Significant Effect on the Environment as an Unusual Circumstance

We now turn to the alternate way a challenger can establish the unusual circumstance prong of the unusual circumstances exception. While our high court in *Berkeley Hillside* held that a mere *reasonable possibility* a project *may* have a significant environmental effect is insufficient to establish the unusual circumstances exception (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1097, 1104), the court also held that "a party may establish an unusual circumstance with evidence that the project *will* have a significant environmental effect." (*Id.* at p. 1105, italics added.) The reason for this alternative method is that "evidence that the project *will* have a significant effect *does* tend to prove that some circumstance of the project is unusual." (*Ibid.*) This method of proving unusual circumstances requires that the project challenger provide more than " 'substantial evidence' of 'a fair argument that the project will have significant environmental effects.' " (*Id.* at p. 1106.) A project challenger must prove that the project *will* have a significant effect on the environment. (*Id.* at p. 1105.) Thus, a challenger seeking to prove unusual circumstances based on an environmental effect must provide or identify substantial evidence indicating: (1) the project will actually have an effect on the environment; and (2) that effect will be significant. (*Ibid.*) A "significant effect on the environment" is "a substantial adverse change in the physical

---

[24] Because we conclude there was no unusual circumstance based on the features of the project, we need not address the second prong of the exception -- whether there is a reasonable possibility of a significant environmental effect on the creek. A negative answer as to the question of whether there are unusual circumstances means the exception does not apply. (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 278.)

conditions which exist in the area affected by the proposed project." (Guidelines, § 15002, subd. (g).)

Appellants made no attempt before the District's board or in the trial court to prove the rodeo project will actually have a significant effect on the environment. The entire thrust of appellants' argument below and on appeal is that the rodeo project creates an environmental *risk* to the Salsipuedes Creek because in their view, there is *a reasonable possibility* that the project *may have* a significant environmental effect on the creek. Their argument is grounded on the assertion that there is a fair argument the rodeo project *may have* significant adverse pollution effects on the Salsipuedes Creek. However, the evidence they rely upon and their arguments fall well short of establishing that the rodeo project *will have* a significant environmental effect on the creek.

Appellants point to a video taken by one of the appellants "during a rain event at the Fairground[]." The video shows muddy rainwater flowing from the horse and cattle area over dirt roads, earth, and vegetation into a drain adjacent to the creek. Muddy water is also depicted pouring out of an underground pipeline culvert. In their appellate briefing, appellants do not assert that there was an equestrian event at the Fairground during this time; nor do they say there was livestock present. And there is no activity taking place, nor are there horses or livestock seen in the video. As the trial court noted, nothing in the video supports appellants' claim that the water depicted therein was contaminated with fecal material. Nor do appellants point to any other evidence that establishes that the water was in fact, contaminated.

Appellants also claim that the record includes photos showing "muddy, contaminated water" exiting the discharge pipe in the creek that drains from that storm drain. We have reviewed the black and white photocopies of these photographs in the record. As the trial court noted, there is no evidence when the photographs were taken. No horses, livestock, or activity are depicted in the photographs. While it is difficult to tell from the copies we have in the record, the trial court (which presumably had original

41

color photographs) noted that there was one photograph that showed something resembling manure, but the court also noted there was no evidence establishing how long the suspected manure had been there, whether it was quickly collected, or whether this was an isolated incident. From what we can tell from the black and white photocopy of that photograph, there is no water flowing in the area of this suspected manure. Furthermore, like the water depicted in the video, appellants point to no test results or other evidence substantiating their bald claim that the water depicted in the photographs was, in fact, contaminated. Nor does this evidence establish a "significant" environmental effect. Appellants merely argue that there is a "reasonable inference" the Fairground contributes bacteria to the creek and that a large event close to the beginning of the rainy season will create pollution sources that "*may have* a significant impact" (italics added) to the creek.

Appellants also rely on public comment which quoted an Internet article from the *High Plains/Midwest Ag Journal* about the annual Reno rodeo. That article read in part, "Rodeo operators say cleanup of animal waste and other debris is a top priority, and loads of manure and straw are removed daily. But there's really no way to capture it all, and some inevitably reaches the river."[25] Appellants cite a research study in the record concerning E. coli outbreaks at agricultural fairs, which indicates that E. coli is frequently found in cattle feces and persists several months after fairs end. Citing another Internet article (this one from an unknown source), appellants assert that "[i]nfections at fairgrounds have resulted from apparent exposure to dirt and dust at the facility, and accumulated on environmental surfaces." Yet, none of this information pertains to the Fairground's operations here or Salsipuedes Creek and thus none of it establishes that the rodeo project *will have* a significant impact on the creek.

---

[25] Ironically, this article shows that rainwater runoff from rodeos into rivers or storm drains that drain into rivers may not be an unusual circumstance.

As they did below, appellants rely heavily on the Regional Water Board's determination that livestock operations in the area likely contribute to fecal coliform in the Salsipuedes Creek. But Board staff actually concluded that there were multiple sources of the fecal indicator bacteria (FIB) in the creek and ranked the sources from the greatest contributor to the least.

Storm drain discharges having nothing to do with the Fairground "likely contributed the most FIB" to Salsipuedes Creek. Staff opined that FIB in these discharges was the result of municipal collection system sewage spills and leaks, urban runoff that contains pet waste, dumpster leachate, and bird, rodent, and other wildlife waste. Pet waste, according to the report enters the watershed through storm drains after it is deposited on sidewalks, parking lots, or other similar surfaces. Regarding dumpster leachate, Board staff wrote that dumpsters may contain animal waste from wildlife and domestic animals scavenging through dumpsters, as well as from humans discarding yard and pet waste into uncovered and/or leaky trash receptacles. Rainwater then carries FIB from these receptacles into storm drains.

"Homeless person/encampments discharge" ranked as the second highest source of FIB contamination. Staff observed homeless encampments at the Salsipuedes Creek and human waste on the banks of the creek and determined that it was "highly likely" that this waste reached surface waters.

The third most significant source of FIB was "pet waste" from sources other than storm water discharges. Staff observed people walking dogs along the Salsipuedes Creek levee and a broken, rusted dispenser that once provided plastic bags for dog walkers to collect pet waste. Since staff had seen people fail to collect this waste in other watersheds, staff opined the same was happening at Salsipuedes Creek.

"Farm animal livestock discharges," related to local agricultural operations, actually ranked fourth behind the aforementioned sources. Staff wrote that there is evidence from other watersheds indicating that FIB from horses and livestock in close

43

proximity to water bodies are the source of FIB contamination. Consequently, "[s]taff determined that FIB from these livestock operations likely contributed to the exceedance of water quality objectives" in the Salsipuedes Creek. The Fairground was lumped into this section of the report. We discuss the references made to the Fairground in the report, *post*.

Ranking fifth was septic system failures. One area where this occurred was the Delaney community, which is adjacent to Salsipuedes Creek. "Staff concluded that onsite wastewater systems in the Delaney community were a likely source of FIB contributing to water quality impairment in Salsipuedes Creek." The community is "on soil with very slow permeability and in which septic take leach fields do not function properly." Also, the community slopes toward the creek.

Three other sources of FIB were listed by Board staff as potential FIB contributors, including natural wildlife sources such as birds, rodents, squirrels, skunk, and deer.

As for the Fairground, which was lumped into the category ranked as the fourth highest likely contributor with other agricultural operations, appellants cite the fact that staff wrote that they "did not see management practices in place that would keep runoff from the manure area from entering surface waters." Yet, staff did not visit when there was a livestock event going on and they only saw one horse on the premises when they were there. Because there were no events underway, staff had no occasion to see the MMP in play. And, as the trial court noted, the report does not even indicate staff had an awareness of the Fairground practices for managing manure when hosting events. Further, the report contained no water sampling results indicating discharges or runoff from the Fairground actually contributed fecal material to Salsipuedes Creek. Moreover, staff did not even report seeing manure on site. The Regional Water Board report does not establish that the project *will have* a significant environmental effect on the creek.

Indeed, the evidence in the record suggests quite the opposite. In December 2010, the Fairground retained an outside vender to take samples as part of the Fairground's voluntary stream monitoring program. Samples were taken "to establish a preliminary set of water quality data focused primarily with equestrian activities and manure management." Samples were taken upstream where Salsipuedes Creek enters the Fairground and downstream at a location where the creek flows out of the Fairground. The first samples, taken December 2, 2010, showed the E. coli concentration upstream was 920.8 MPN/100 mL while the concentration downstream was 547.5 MPN/100 mL. Samples taken on March 18, 2011, five days after a different rodeo event took place at the Fairground (which apparently was not challenged by appellants), showed the E. coli concentration at the upstream location to be 3,800 MPN/100 mL and the concentration at the downstream location to be 1,700 MPN/100 mL. Thus, as reported in the District Board of Directors meeting on March 22, 2011, "The water sample testing of the storm water run-off in Salsipuedes Creek after the latest storm shows that the water leaving the Fairground[] is actually cleaner than where it comes onto the Fairground[]." At the April 26, 2011, District Board meeting, the Fairground manager reported to the Board that samples taken the week before the meeting, after another equestrian event at the Fairground, "showed that the water is cleaner when it leaves [the Fairground] than where it enters." The sample taken from the upstream location showed an E. coli concentration of 999,999 MPN/100 mL and the sample taken downstream from the Fairground showed an E. coli concentration of 151.5 MPN/100 mL. While there is no evidence in the record explaining any of these results, the results nevertheless cut against a finding that Fairground operations or the rodeo project *will have* a significant environmental effect to the creek.

Lastly, we note that appellants' contamination risk argument is grounded on storm water run-off transporting manure from the livestock areas into the creek. But the record before us indicates that even the potential for any environmental effect is far less than

significant based on this theory because the average precipitation in the area on October 1 and 2, the dates when the rodeo project was scheduled, is less than two-hundredths of an inch.

We conclude that appellants have failed to establish unusual circumstances based on substantial evidence that the project *will have* a significant effect on Salsipuedes Creek.

### 3. Conclusion

Because appellants have failed to establish the unusual circumstances prong of the unusual circumstance exception under either *Berkeley Hillside* alternative, we conclude that the exception does not apply to preclude application of the Class 23 exemption for normal operations of public gathering facilities.

### DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

 

 

 

                                    Murray, J.

 

We concur:

 

 

Mauro, Acting P. J.

 

 

Duarte, J.

46